# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| IRVING and ANA ROSNER, ANDREW and IRENE TIBOR, DAVID and IRENE MERMELSTEIN, ETHEL and MARK KLEIN, REGINA BASKIN, EDITH REINER LEOPOLD FETTMAN, MARLA SIMON, and LASLO SOKOLY, on behalf of themselves and all others similarly situated, | No. |
| Plaintiffs, |  |
| v. |  |
| UNITED STATES OF AMERICA, |  |
| Defendant. |  |

CIV - SEITZ

MAGISTRATE JUDGE GARBER

## COMPLAINT - CLASS ACTION

## I.   NATURE OF ACTION

1.      This is a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure for unconstitutional taking, breach of implied-in-fact contract of bailment and violation of conventional and customary international law, for which plaintiffs and class seek an accounting, restitution and damages.

2.      Plaintiffs, Hungarian Jews who were persecuted and imprisoned by the Nazis during World War II, and their descendants, are suing for the loss of their property that was received by the United States Army during World War II and never returned to them. While plaintiffs and members of the proposed class suffered in concentration and forced labor camps, the pro-Nazi Hungarian government confiscated all of their family money and possessions (referred to herein as "the stolen Jewish property"). As the Russians advanced through Hungary in the fall and winter of 1944-45, near the end of the



war, the pro-Nazi Hungarian government of Ferenc Szalasi, leader of the violently anti-Semitic Arrow Cross Movement, at the direction of the Nazis loaded the stolen Jewish property, stolen from Hungarian Jews, onto a train bound for Germany.  Because of the value of the train's contents, the train became known as the "Gold Train" or the "Hungarian Loot Train."  It is referred to herein as the "Gold Train."

3.     In May 1945, the Hungarian officials in charge of the Gold Train sought out representatives of the U.S. Army in western Austria to whom they wished to surrender the train and its contents.  A U.S. Army unit took charge of the Gold Train on or about May 11, 1945, at the Tauern Tunnel, south of Salzburg, Austria.  The U.S. Army therefore took control of the Gold Train and soon thereafter found out that it contained the personal property and valuables of dispossessed Hungarian Jews who had been persecuted under the Nazi-sponsored Arrow Cross regime.  The U.S. Army found documents on the Gold Train which listed the identities of an undetermined number of the owners of the valuables that had been forcibly placed on the Gold Train by Arrow Cross officials and Nazi officials.  Many of the items on the train were in carefully locked containers with the names and addresses of the owners on the outside.  Much of the property was, therefore, identifiable property.

4.     Instead of returning the property to its rightful owners, in violation of law and policy regarding the return of identifiable property, the U.S. military authorities in charge of the U.S. Zone of Occupation of Austria allowed senior officers and civilian officials of the U.S. Allied Command, Austria ("USACA") to requisition precious rugs, family china, silverware sets, high-quality linens and glassware for their personal use and for the use of Army billets and offices of USACA agencies in Salzburg, Linz, Wels, and Vienna.  Falsely maintaining that the property was untraceable and unidentifiable, the U.S. government ultimately allowed items to be sold or distributed through outlets of the Army Exchange Service, transferred the Gold Train property to an international relief

agency (Inter-Governmental Committee on Refugees-IGCR, later known as the International Refugee Organization – IRO), which then auctioned it off in the United States or sold it through commercial and financial channels in Europe. The ultimate disposition of most of the requisitioned property is unknown, but none of it was returned to its owners or their heirs.

5.      The U.S. made no attempt to identify the rightful owners of the Gold Train property; it did not publish any notices in newspapers in Europe, the U.S. or Israel regarding the property, nor did it respond to repeated requests from Hungarian Jewish Community Organizations for information about the property. It ignored identification of many items which would have made return of the property possible. As a result of the defendant's actions; plaintiffs and the putative class members had to struggle to rebuild their lives from nothing. Their monetary assets and family heritage were lost to them, seemingly forever.

6.      Decades after World War II, a Presidential Advisory Commission on Holocaust Assets (the "Holocaust Commission") was formed. Based upon review of newly declassified documents, the Holocaust Commission called the treatment of the stolen Jewish property by the U.S. "an example of an egregious failure of the United States to follow its own policy regarding restitution of Holocaust victims' property after World War II." The Holocaust Commission found that the appropriation of the stolen Jewish property took place "at the highest levels" and identified five generals who "took valuables from the gold train to furnish their residences and offices."

7.      Plaintiffs have only recently discovered the possible fate of their property and the U.S.'s role in its loss. While the post-war conduct of American troops occupying Germany is generally reported as commendable, what the U.S. did with this particular property in Austria was morally and legally wrong resulting for all practical purposes in a second taking of the Holocaust victims' property after World War II. Defendant's

actions violated basic principles of bailment contracts, prohibitions against the taking of property without just and adequate compensation and well-established rules and principles of international law that prohibit confiscation of civilian property, and was in breach of State Department and governmental policy and rules at the time.

## THE PARTIES

### A.     The Named Plaintiffs

### 1.     Mr. Irving Rosner

Plaintiff Irving Rosner lives in the Aventura area of Miami-Dade County, Florida. He was born on October 10, 1922, in the town of Beregujfalu, which was located in Czechoslovakia until 1939 when his area was annexed by Hungary. He lived with his father Herman Rosner and mother Helen Rosner until 1943, when he was forced to go to a work camp digging bunkers. Plaintiff Rosner had been in the textile business, and left yards of fabrics (wool, silk, cotton, damask) at this parents' house, which they buried beneath the kitchen floor. During a police raid, the Hungarians broke through the floor in his parents' house and confiscated all of his textile materials. In April 1944, Mr. Rosner's parents were forcibly removed from their home and deported to Auschwitz. They had to leave behind important personal possessions such as jewelry, silver, and his father's shoe manufacturing equipment. After being liberated from the camps, Mr. Rosner returned to Hungary, and found his relatives had all died, and his house had been turned into a stable for the Germans. He believes it is extremely likely that his family's possessions were placed on the Hungarian Gold Train.

### 2.     Ms. Ana Rosner

Plaintiff Ana Rosner lives in the Aventura area of Miami-Dade County, Florida. She was born Ana Gelbman on February 16, 1924, in the town of Beregszasz, which was in Czechoslovakia until 1939 when it was annexed by Hungary. She lived with her parents Joseph and Rose Gelbman. On the day after the Jewish Passover holiday in April

No. 201591 BNC DOC

1944, the Nazis and Hungarian police forced her family out of the house, and marched them to a ghetto in Beregszasz with all of the other Jewish residents from the town. They were given no time to pack and were forced to leave all their belongings in the house. The left valuable silverware, silver service, candlesticks, other items of personal importance to their family, such as her brother's expensive musical instruments. The Gelbman family was soon shipped to the Auschwitz "concentration" camp, really a death camp, by cattle car. Ana's parents perished at Auschwitz. Ana was forced to march, with the surviving camp inmates to a camp called Bergen-Belsen, in Germany. Probably half of the camp inmates died during the march, which came to be known as the "Death March." After being liberated from the camps, Ana returned to Hungary, to see who, if anyone in her family survived. The house was empty, and she believes it is extremely likely that their family's possessions were placed on the Hungarian Gold Train.

> **3.     Mr. and Mrs. Irene Andrew Tibor**

Plaintiff Andrew Tibor now lives in Aventura, Miami-Dade County, Florida. He was born in the year 1918 in the town of Dbrecen, which was part of Hungary in 1939 through 1945. He was taken away to a forced labor camp in Hungary in 1940, but returned to Budapest in 1943, where he married plaintiff Irene Ecker. She became pregnant and had a child in 1944, but in the interim Mr. Tibor was sent back to another forced labor camp. Irene Tibor and their baby were later forced out of their apartment and went to live with her mother, taking some of her possessions and leaving the others behind. Among those possessions were unique and personal silver candlesticks, a silver menorah, a silver jewelry box, and Irene's sewing machine. Ultimately, Irene and her mother were forced out of their Budapest apartment, and all their possessions were confiscated. Irene Tibor's mother was killed at Auschwitz, and Irene survived in a "Jewish Home" in Budapest (under extremely adverse conditions occasioned by the Nazis' theft of their food, water and supplies). After liberation, Andrew Tibor returned to

- 5 -

Budapest and found all of their personal possessions, as well as all of Irene Tibor's family's possessions, gone. Andrew and Irene Tibor believe their possessions were likely to have been placed on the Hungarian Gold Train.

### 4.     Mr. David Mermelstein

Plaintiff David Mermelstein lives in the Kendall area of Miami-Dade County, Florida. He was born in Berekivest, Hungary, in 1929. He was eleven (11) years old in 1944 when his parents, four brothers, younger sister, grandmother, and aunt, who all lived together, were forced out of their home, first the ghetto in Bereksaz, and then to the Auschwitz death camp. They were given less than two hours to leave and were only allowed to take what they could carry. Their house was sealed by the Hungarian and Nazi army, and his family was forced to leave behind all their valuables, including separate sets of silver candelabras and kiddush cups belonging to his mother, grandmother, and aunt. He believes it is extremely likely that their property was placed on the Hungarian Gold Train.

### 5.     Ms. Irene Mermelstein

Plaintiff Irene Mermelstein lives in the Kendall area of Miami-Dade County, Florida. She was born in Berekivest, Hungary. She lived with her parents, who owned a store that sold hardware, as well as fine porcelains dishes with gold trim. Her father also installed glass windows in his business. Irene was a young girl in 1943 when her father was taken away from their home at the age of 39. Irene never saw him again. In 1944, the Nazis and Hungarian army came to raid the Jewish homes, and Irene and her mother buried their jewelry, including a distinct and valuable necklace given to Irene's mother by her grandfather in the alley outside their house. The family was deported to the Auschwitz death camp, and Irene was the only member of her family to survive. She returned to their home after liberation and found the house empty. All the jewelry,

hardware and porcelain were gone.  She believes it is extremely likely that their property was placed on the Hungarian Gold Train.

### 6.    Ms. Ethel Klein

8.    Plaintiff Ethel Klein is a resident of the Aventura area of Miami-Dade County, Florida.  She was born in Beregszasz, Hungary.  She lived with her seven (7) brothers and sisters with their parents.  Her father had a shoe business and shop which was part of their house.  She was 17 years old in 1944 when the Nazis and Hungarian Army forced the family out of their house, and shipped them in cattle cars to the Auschwitz death camp.  They were not able to take any of their possessions with them. Ethel was forced to March from Auschwitz to the German camp known as Bergen-Belsen, and was one of a small number of Jews who survived the march.  After she was liberated from Bergen-Belsen, Ethel returned to her family's home and found everything, including their silver, jewelry, and their father's shoemaking equipment and inventory, missing from their house.  She believes it is extremely likely that their property was placed on the Hungarian Gold Train.

### 7.    Mr. Mark Klein

Plaintiff Mark Klein is a resident of the Aventura area of Miami-Dade County, Florida.  He was born in the town of Muncacshevo, Hungary, in 1921.  In 1942, he was forced to a labor camp at Mohacs, Hungary.  He was forced to work as a slave laborer throughout the war, until he ended up in the notorious Buchenwald concentration camp. After liberation, he returned to his home and learned that his parents were never coming home  Everything his family had owned was gone from their house, including their jewelry, wardrobe, and the silverware and silver candles and kiddush cups his mother had brought into the marriage.  He believes it is extremely likely that their property was placed on the Hungarian Gold Train.

- 7 -

**8.     Ms. Regina Baskin**

9.      Plaintiff Regina Baskin was born in Romania in 1928, which became part of Greater Hungary.  When Ms. Baskin was fourteen years old, Hungarian Nazi troops arrived at her door and forced her and her parents to leave at gunpoint.  The soldiers took custody of all her family's possessions, while she and her family were sent to Auschwitz. Ms. Baskin believes these possessions were loaded on the Gold Train

10.     In 1949, having survived the Holocaust, Ms. Baskin came to the United States seeking freedom.  She is a naturalized United States citizen and is currently a citizen of Michigan.

**9.     Ms. Edith Reiner**

11.     Plaintiff Edith Reiner was born in Hungary in 1925.  She is the sister of plaintiff Dr. Laszlo Sokoly.  She now lives in Budapest.  In April 1944, she was taken to the Auschwitz concentration camp in Poland where she was permanently branded with number A20612.  On December 7, 1944, German soldiers confiscated the contents of her home in Szkolyi, Hungary as described above.

**10.    Mr. Leopold Fettman**

12.     Plaintiff Leopold Fettman was born in Hungary in 1925.  In 1944, Nazi forces in Hungary forced Mr. Fettman at gunpoint to leave his home and to give the soldiers all his family's possessions.  He was then imprisoned at Auschwitz.  Mr. Fettman believes his possessions were confiscated from his home and ultimately loaded on the Gold Train.

13.     In 1960, having survived the Holocaust, he came to the United States seeking freedom.  He became a naturalized United States citizen in 1964.  Today, Mr. Fettman is a cantor residing in Nebraska.

### 11.   Dr. Laslo Sokoly

14.     Plaintiff Dr. Laszlo Sokoly was born in Hungary in 1926.  In 1944, when he was a young man, the Nazi's forced him into the Jewish Ghetto in Szecseny, Hungary solely because he was Jewish.  Later he was assigned to camp number 107/310 located in Kiskunlachaza, Hungary and then transferred to the Forced Labor Camp in Szentikiraliyszabadja from May to November 1944.  His parents and 28 other family members all died at Auschwitz in June 1944.  In November 1944, he survived the death march to Mauthausen and Gunkirchen, Austria.

15.     On December 7, 1944, Nazi gendarme confiscated the contents of his home in Szkolyi, Hungary.  The Nazis removed all furniture from the home including many paintings, a Persian coat, five diamond rings including one with a flawless stone, two gold watches, two gold bracelets, a gold necklace, five Persian rugs including a Naim, silver service for 18, a Bosendorfer piano, fine china and many other valuable home furnishings.  The paintings included five by Janos Viski, four by Ivani Greenwald and a portrait of a family member by renowned Hungarian artist Gyula Benczur.  The home was built in 1796 by Dr. Sokoly's ancestors and was one of the largest homes in the town.  The Nazis occupied his house and used it as its headquarters.  The house is now an art museum, donated to the town by Dr. Sokoly.  Dr. Sokoly believes his family's confiscated possessions were on the Gold Train.

16.     In 1956, having survived the Holocaust, Dr. Sokoly escaped from Hungary and came to the United States seeking freedom.  He is a naturalized citizen, and currently resides in Maryland.

### 12.   Ms. Marla Simon

17.     Plaintiff Marla Simon is a second generation American Jew of Hungarian ancestry.  Ms. Simon is the heir to her grandmother, Malka Katz.  Her grandmother's possessions, as well as the possessions of six of her uncles, were confiscated by the

Nazis.  Her uncles ultimately died in concentration camps in Europe during or after World War II.  Ms. Simon believes her family's confiscated possessions were loaded on the Gold Train.

18.     None of the plaintiffs assert claims in excess of $10,000.

**B.     Defendant**

19.     The United States of America is the government of the United States as defined in the Constitution of the United States.  At all times relevant to this complaint, the United States Military was an instrumentality of the United States, subject to its direction, control and subject to the laws that govern the United States, including restraints imposed by the United States Constitution, domestic law, international law and legal conventions based on human rights and decency.

## II.     JURISDICTION

20.     This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1346 (District Court jurisdiction); 28 U.S.C. § 1350 (Alien Tort Statute); 28 U.S.C. § 1331 (federal question statute); and 5 U.S.C. § 702 (Administrative Procedure Act, for non-monetary claims).  Conventional and customary international law applicable to this case and enforceable in this Court as federal common law is evidenced by a variety of sources, including but not limited to:  The Convention Concerning the Laws and Customs of War on Land (1907) (The Hague Convention) and existing U.S. military regulations and policies as well as well-established rules of general customary international law.

21.     The Court has personal jurisdiction over all parties in that plaintiffs are United States citizens or consent to jurisdiction and the defendant is the United States government.  Sovereign immunity has been waived under the above named statutes.

22.     Venue is proper in this Court under 28 U.S.C. § 1391(e).

### III.   STATEMENT OF FACTS

**A.   During World War II, Germany Confiscated the Property of Hungarian Jews as Part of Its Systematic Campaign to Exterminate All Jews**

23.    In 1941, there were about 725,000 Jews in Hungary out of a total population of 14,683,323. The local government categorized an additional 100,000 individuals as being of Jewish descent. Hence, there were about 825,000 Jews in Hungary when the Nazis invaded the Soviet Union. 50,000 of them were killed or died of malnutrition and hypothermia on the Eastern Front as conscripts in labor service battalions. These auxiliary units – punitive for the Jewish population of Hungary – were attached to Hungarian divisions that were ordered to the Soviet Union in a show of support to the German Army. Following these war-related casualties, the net total of Jews living in Hungary dropped to about 775,000; 175,000 in Budapest and 600,000 in the countryside.

24.    Not satisfied with the way the Jewish community had been dealt with, the Germans invaded Hungary on March 19, 1944, thereby sealing the fate of its substantial Jewish population. In mid-April, 1944, the regime legalized the expropriation of Jewish-owned property in Greater Hungary. Jews were forced to register their assets with the authorities and the contents of their safe-deposit boxes were frozen. On April 21, 1944, Jewish businesses were shut down. In Budapest alone, 18,000 Jewish stores were shuttered. Adolf Eichmann supervised what the Nazis ghoulishly called "the final solution of the Jewish Question in Hungary." He laid out a systematic plan of deportation of the Hungarian Jewish population by geographical quadrant – "first in the northern border areas of Hungary, then in the east, the south and the west, and finally in Budapest." Jewish ritual objects were amassed in specialized centers like the Nazi-inspired Hungarian Institute for the Research of the Jewish Question in Budapest.

- 11 -

25.     The actual deportations began on May 15, 1944. By mid-July 1944, Hungary had lost about 458,000 Jews to the gas chambers and ovens of Auschwitz, Poland. With a quarter of a million Jews packed into Budapest, the second phase of the Hungarian solution to the Jewish Question was implemented. In late August 1944, the Lakatos government won the approval of the Germans to place these surviving members of the Jewish community in small towns around Budapest. Faced with an aggressive Soviet counter-offensive which had broken through Hungary's eastern defenses on October 7, 1944 and the fresh liberation of Western Europe by Allied troops, pressure mounted on the Hungarian government to reach some form of compromise with the Allied powers in a last-ditch effort to save face and salvage what it could from its crumbling regime, without having to face a possible Soviet occupation. Everything changed on October 16, 1944, when the Arrow Cross Party of Hungarian Nazi Ferenc Szalasi forced Admiral Horthy to resign as Regent of Hungary and Szalasi promoted himself the new leader of a Hungarist Empire.

26.     By that time, the Hungarian government had decreed all Jewish-owned wealth and property to belong to the Hungarian government. A special ministry was even formed to focus solely on Jewish property questions. Jews were forced to deposit all their valuables, gold, silver, precious stones, and valuable household items – in so-called Savings Banks. Some of the larger Savings Bank branches that received Jewish property were located at Miskolc in eastern Hungary and at Pecs, several hundred miles south of Budapest.

27.     On November 3, 1944, the Arrow Cross regime reaffirmed the Horthy decrees on Jewish property as belonging to the Hungarian State. This order reinvigorated Arrow Cross bands in their zeal to strip Jews of everything they owned through relentless, murderous raids on their property in Budapest and outlying areas where Jews remained.

1360 100011 BSC DOC

28.    Between the fall of the Horthy regime in October 1944 and the entrance of Soviet troops in Budapest on February 13, 1945, a train laden with stolen Jewish property left Budapest, with Arpad Toldi, the former Prefect of Szekesfhercar who was named Government Commissioner for Jewish Affairs (A zsidougyek kormanybiztosa) as trainmaster. Under Toldy's administration, thefts of Jewish property increased in exponential proportions. Moreover, Toldi "legalized" the sequestration of Jewish assets and valuables while supervising the wholesale plunder of Jewish property throughout Hungary. This train, called by some the Gold Train, was filled with the treasuries of small towns, the personal assets of Hungarian Jews, and valuables belonging to non-Jewish individuals fleeing Soviet troops. It headed west towards Austria and made an initial stop at a town called Zirc.

**B.    History of the Gold Train**

29.    As the Gold Train rolled out of Budapest, the aim of the Nazis was to stay ahead of the advancing Russian army. Heading westward through farmlands, vineyards, and orchards, the train set out on a precarious journey. As it continued throughout the countryside, other property belonging to wealthy Hungarians was voluntarily loaded onto the train to avoid seizure by the advancing Russian army. Many of the Hungarians who voluntarily packed their belongings on the train followed behind in cars, buses, or other trains. After the valuables were collected, the Nazis loaded them on to the Gold Train. This lengthy train consisting of over 40 cars, made its way from Hungary into Austria, but never made it to German territory.

30.    On or about May 11, 1945, the 3d Infantry Division, 15th Regiment, A Company, commanded by Lieutenant Joseph A. Mercer, entered the Tauren Tunnel, sixty miles south of Salzburg. They discovered a partially concealed train crammed with gold and other valuables. A Hungarian military escort handed over the train intact -- apart

from minor cases of theft and blackmail and without its doors having been forced open –

to American soldiers in Werfen, Austria.



**Austria/Werfen/The Hungarian Train — Detail of train with evacuated Hungarian art treasures**



**Austria/Werfen/The Hungarian Train
Train with evacuated Hungarian art treasures**

- 14 -



**Austria/Werfen/The Hungarian Train**
**The Hungarian train of loot — view of freight cars**

31.     The United States understood that this property belonged to individual Jewish victims of the Nazi Holocaust. Most of the containers on the train remained sealed. Only a few had been tampered with. Many of these containers contained carefully placed identifiers, put there by the Jewish families who has hoped to reclaim their belongings someday. The train was jointly guarded by the Hungarian guards and soldiers of the 3d Infantry Division. A guard detail was assigned to protect the train. The cars containing gold and diamonds were posted with double security, and the complete area was declared off-limits to unauthorized personnel.

32.     Because of the widespread destruction of the railway system, the train remained in Werfen until July 18, 1945. The U.S. Army then abandoned the steam locomotive at Werfen and connected an army locomotive to the train for the last thirty miles of its precarious journey. The train finally left the rail siding in Werfen under the tight security of both the 101st Airborne and Hungarian guards, bound for the

- 15 -

Stuberkaserne army barracks located on 51 Klessheimer Allee in the Marglan suburb of

Salzburg. The United States then took possession of the Hungarian Gold Train assets and

moved many of them to storage facilities in Salzburg, Austria. It took four days for two

U.S. Army trucks to move the valuables from the train to the ground floor of a former

Wehrmacht warehouse, one hundred yards away. The cargo included 850 chests of

silverware, 5,000 hand-woven Persian rugs, alarm clocks, watches, cameras, bolts of

cloth, underwear, topcoats, typewriters, chinaware, stamp collections, coin collections,

cases of diamonds, cases of gold coins, and large amounts of currency. The warehouse

was selected because it was considered to be a fire-resistant, dry, burglarproof building.

Assigned as guards during the four days of unloading were soldiers of G Company, 242d

Infantry Regiment, 42d Division.

33.     The unloading was completed on August 29, 1945. The fate of this

treasure was now in the hands of the Americans, especially Major General Harry J.

Collins.

34.     The story of the Gold Train was summarized in a poignantly written report

by the Central Board of Jews in Hungary to the State Department, on July 28, 1947:

> In April 1944, after the invasion of Hungary by the
> Germans, the Fascist Government of Hungary of those days
> issued a discriminatory decree against the Jewish
> population obliging them to deposit their gems, their
> golden jewels ornamented with gems, and generally all
> their valuables made of gold with the Authorities. This
> provision went so far as to oblige Jewish individuals to
> deliver their wedding rings.
>
> Accordingly the jewels and other valuables of 800,000
> Hungarian Jews were seized by the Fascist Government.
>
> On the approach of our liberators, the Nazi government of
> Szalasi had these valuables laden on a train consisting of 44
> cars and had them abducted westward under military
> escort. This railway train was seized in May 1945 by the
> U.S. troops of occupation. This was the so-called 'Gold
> Train.' The wagons contained other valuables, too, besides
> the jewels, e.g., oriental carpets, silver, furs, etc. ... [T]he
> Hungarian military escort handed over the train pushed into

- 16 -

the railway tunnel near Boeckstein intact apart from minor cases of theft and blackmail and without its doors having been forced open, to the American troops of occupation at the railway station of Werfen.

35.     The Central Board of Jews also referred to various reports available on the

Gold Train:

There is a report available on the jewels and golden valuables ordered by Commander Arpad Toldy to be laden on two lorries and carried to the French zone, where they were seized by the French troops.

According to these reports the following valuables were taken under control by the United States Military Authorities:

10 cases with marking indicating contents of gold. Average weight of cases 45 kg.

1 case containing gold coins.  Average weight 100 kg.

18 cases marked as containing gold jewels.  Average weight 35 kg.

32 cases containing golden watches, weight varying from 30 to 60 kg.

The following amounts of foreign currencies were handed over in a closed trunk:  $44,600, Swiss Francs 52, 360, L 84, Palestinian L 10, Canadian Dollars 66, Swedish Kronen 5, Reichsmark 15, Pengo 260,484.  This trunk contained a sealed package, containing brilliants.

1560 cases containing silver with different weights.

1 case of silver bricks.

About 100 artistic pictures

About 3000 knotted Persian and Oriental carpets and some home-manufactured carpets sporadically, among them.

I cannot tell exactly the number of the cases.  According to the reports received from the officials, there were also clothes, fur-coats, made of noble furs, stamp-collections, collections of laces.  Cameras, gramophons [sic], silver-jewels, porcelains, pocket and wrist watches (about 8-10,000) laden into the wagons.  The contents of two

- 17 -

> wagons were not assorted, they contained every sort of
> valuables mixed.

36.    The Central Board of Jews repeatedly requested information on how Jews

could reclaim their stolen property.  These requests were either ignored or stonewalled.

37.    On July 27, 1948, then Secretary of State George C. Marshall described

his own understanding of the fate of the Gold Train in a cable sent to the U.S. Legation in

Budapest:

> Prior to their withdrawal from Hungary the Nazis had
> collected a considerable quantity of movable property
> belonging to Jewish victims of Nazi action.  It is
> understood that this property belonged to Jewish victims in
> all parts of so-called Greater Hungary.  It was removed by
> train to Austria, where, having been separated into two
> trains, it was found by American and French forces.

38.    The U.S. forces removed the assets found on the Gold Train to storage

facilities in Salzburg, Austria.  The majority of the assets were stored in the Military

Government Warehouse (also referred to as MG Warehouse or the Property Control

Warehouse).  The paintings from the Gold Train were stored elsewhere, according to

undated notes from Ardelia Hall. the State Department's Advisor for Restitution issues.

Hall's notes detail the storage of the Gold Train paintings:

> Train – Wurfen – stopped there in Wurfen [sic].  Mostly
> property Nazis looted from Jews.  Paintings brought to
> Salzburg in storage in Karabinersaal in Residenz.

**C.    U.S. Restitution Policy**

39.    In 1946, the United States signed two international agreements that

directly affected the disposition of the Gold Train assets:  the Final Act of the Paris

Reparation Conference and the Five-Power Agreement for Non-Repatriable Victims of

Germany.  These agreements laid the basis for the creation of the Preparatory Committee

for the International Refugee Organization ("PCIRO") and permitted the sale of non-

monetary gold and other ownerless property for the benefit of non-repatriable refugees.

- 18 -

Such agreements should not have been applied to Gold Train assets, for many of the assets on the train were identifiable.

40.     The United States followed a different policy towards works of art and other cultural property of either religious, artistic, documentary, scholastic, or historic value.  In accordance with longstanding international agreements, the United States adhered to the principle of restitution of such national cultural heritage to the country of origin.  Within this principle, there were no limitations based on a nation's status – as former enemy, military ally, or neutral.  The United States determined that "[i]dentifiable looted works of art and cultural material will be restituted to the governments of the countries from which they were taken."

41.     Reflecting this decision, the United States extended restitution of cultural property encountered in Germany and Austria to Italy, Hungary, Romania and Finland by an order issued by the State-War-Navy Coordinating Committee ("SWNCC") on March 4, 1946.  Pursuant to this order, property had to be "restored to the government of the country from which it was taken or acquired in any way …"

**D.     The United States Made Little to No Effort to Return the Property to Its Owners**

42.     Thus, as identified above, the U.S. government and military authorities were required under their own regulations and policies to determine if the looted property could be retuned to its owners.  Unfortunately, these authorities, despite overwhelming evidence to the contrary, declared that it was not possible to identify either individual ownership of the property on the Hungarian Gold Train or even the appropriate country of ownership because of Hungary's shifting borders.

43.     On June 4 and July 13, 1946, General Mark Clark sent telegrams to the War Department and Department of State.  The message in both was that "the property now contained at the United States Military Government Warehouse, Salzburg, is of

- 19 -

unknown origin and ownership." In an apparent attempt to clarify the situation, on
August 23, 1946, the U.S. Department of State issued a telegram (WARX 98112) to
General Clark. Its intent was to clarify the terms of the Final Act of the Paris
Conference, Article 8D. Article 8D provided that property would not be returned to the
owners if determination of national origin was impractical or if the lawful owners had
died or ceased to exist without legal successors. It also stated that property could be
disbursed to the Inter-Governmental Committee for Refugees ("IGCR") if determination
of individual ownership was impractical. Regardless of the claims in the telegram, the
truth is that the Gold Train property in the Property Control Warehouse was known as to
its national origins and in many cases was still identifiable as to individual ownership.
The telegram further directed that property turned over to the IGCR must be removed
from Austria and Germany and sold in acceptable foreign currency outside these two
countries.

44.     In fact, there is powerful evidence that many of the items could be
identified.

45.     The United States military officers knew as of the last week of May 1945
that a significant portion of the items found on the so-called Werfen Train or Hungarian
Loot/Gold Train, belonged to Jewish victims of the Hungarians and Germans.

46.     A Target Force, specially constituted in July 1945 to inventory and sort
the items found on the Werfen Train and deposited at the Military Government
Warehouse, found documents in Hungarian that described the ownership of an
undetermined amount of the items placed on the train by fleeing Hungarian Nazis.

47.     These papers were brought to the attention of Lieutenant Colonel Homer
Heller, the first Property Control Officer in charge of the Werfen Train property at the
MG Warehouse in Salzburg, Austria.

48.     There were clear indications in the inventory conducted in late July 1945 at the Salzburg Warehouse that a number of items on the train were identifiable.

49.     There is no evidence in the available documents to indicate that U.S. forces made any effort to proceed with the identification of the items that came from the Werfen Train, before and after the United States government established a uniform policy for restituting identifiable and unidentifiable items.

50.     The U.S. Army took three inventories of the number of railroad cars carrying valuables on the so-called Werfen Train.  A comparison of each of these inventories reveals that three railroad cars present at Werfen did not make it to Salzburg, Austria.  These cars presumably contained gold, diamonds, rugs, and other items.  No document indicates that the U.S. Army reorganized the contents of the train and eliminated those three cars.

51.     Several thousands objects were loaned to U.S. military personnel in Salzburg, Linz, Wels, and Vienna.  Only a small percentage (not more than 20%) were ever returned to the Warehouse, despite the fact that it was common knowledge at USFA in Vienna and Salzburg as of early 1947 that the Werfen Train property was subject to restitution to the IGCR.

52.     A 1947 investigation by the Property Control Branch revealed that all the items on loan were still accountable, but that no procedures had been set in place to effect the proper return of the borrowed items to the warehouse.

53.     The documentation shows clearly that the Reparations, Deliveries & Restitution Division of USACA ignored the repeated pleas of the Property Control Section at Salzburg for additional staffing support in order to manage the fate of the Werfen Train property and safeguard it from any outside tampering.  This state of affairs forced the Property Control Section to press for the transfer of accountability for loaned items to another section of USACA.

54. Three tons of silver Jewish ritual objects were stored at the Warehouse for three years without any consideration for its restitution to the Jewish communities of Hungary. Some of the pieces were classified as museum-quality objects, irreplaceable, impossible to replicate, and of unique craftsmanship. These objects were eventually shipped to the Central Collecting Point at Offenbach, Germany. The uniqueness of the objects would have made them readily identifiable as to town or community of origin and, therefore, subject to restitution, other than through a wholesale distribution system such as the Offenbach depot.

55. Many of the items were heirlooms and distinctive pieces. These included artwork, rugs and other highly distinctive items of furniture and personal possessions.

56. In many cases, Hungarian government authorities had made receipts and kept records of the items confiscated by the Nazis. The Hungarian Nazi government catalogued items on the train and the Presidential Commission found that a list of property owners accompanied the treasures into American custody. Moreover, in order to placate Jewish families from whom the property was stolen, the Nazis often asked them to create inventories and, in some cases, even issued receipts. According to the Presidential Commission's Research Director for Gold Assets, a partial Inventory of Gold Train property still exists and he believes much of the extant valuables can be identified. Moreover, in an October 15, 1999 National Public Radio interview ("All Things Considered"), Stuart Eizenstat, a Presidential Commission Member and then Deputy Secretary of the Treasury, said: "Of the 1,181 works of art [on the Gold Train], some of which are very valuable - Durers and Rembrandts - about half have significant markings indicating ownership and some identification."

57. Further, much of the personal property on the train remained sealed in containers that bore the family name of the owners. Many of the items were in containers that had been carefully labeled by the families from whom the property was stolen.

58.     The items here in boxes and the organization of the boxes was based on where and when the assets had been collected, and the boxes were such that collections belonging to families was kept intact.

59.     American Property Control officers completed a general inventory of the train's contents that had been unloaded on the ground floor of the Salzburg Military Government Warehouse. Including in their inventory was a box said to contain "lists of names of people from whom some of the items on the train were taken." The interrogation in July 1945 of Dr. Laszlo Avar – the train's Hungarian custodian – yielded information that "the train contained items which had been taken mostly from Jewish people and from banks in Hungary." This made identification easy to accomplish.

60.     Hungarian officials were aware that the Property Control Warehouse had not been guarded adequately and that large-scale looting had further decimated the valuables stored within. Hungarian museum objects and religious relics were displayed openly in Salzburg merchants' windows. The black market for items was so lucrative that the Hungarian government protested the lack of security and stressed that while Austria had not won the war with the Allies, it apparently was sharing in the property seized from civilians. More valuable items were burglarized from the Property Control Warehouse in Salzburg than in any other one place in occupied Europe. The Hungarian Restitution Ministry then filed a claim for the Kisfaludi collection and wrote for permission to inventory the warehouse for additional Hungarian claims. The Hungarian secretary of finance, Mr. Nyardi, insisted that all of the train's contents be returned to his native land for the benefit of the 100,000 remaining Hungarian Jews. Nyardi was informed that because of the terms of the Final Act of the Paris Conference, Article 8D, signed by the United States, England, and France, Hungarian Jews would not receive their confiscated property and that it would be sold for the benefit of Jewish victims from

Germany and Austria. Despite protests from Hungary, the valuables from the Budapest train would not be returned.

61.     Based on the previous unsubstantiated telegrams from General Mark Clark that asserted a lack of proof of ownership, Captain Howard Mackenzie was notified that all previous instructions concerning the Hungarian valuables were superseded by cable number WX-85682. This cable, sent on November 16, 1946, from the Joint Chiefs of Staff, stated that all valuables in the Property Control Warehouse, with the exception of Jewish items of cultural or religious significance, would be turned over to the IGCR. Again this directive underscored the fact that national origin or identification of ownership of the property was impractical. Again, this was simply untrue – still remaining in the warehouse and unopened were 2,732 boxes, trunks, suitcases, and other containers of valuables. Proof of ownership lay in Captain Mackenzie's testimony as a witness for the prosecution during the court-martial proceedings of enlisted men on September 27, 1946. The testimony follows:

> COURT-MARTIAL MEMBERS: Small objects of high value for their size, was there any effort to lock them in boxes or safes to make them secure from people walking through there?
>
> CAPTAIN MACKENZIE: They were kept in the original containers because it was felt if they were removed the means of identification would be lost. A great deal of material the ownership of which has never been determined is in there…. Most of the valuable material is nailed into boxes. Some of the most valuable material is still in the original suitcases and baskets and trunks in which they were found.

62.     Because of such proof, the Hungarian government was positive that the items would be returned. They had recouped from the Americans their gold and silver reserves, and the French had returned most of the gold bars that had been removed from the train during its backtracking through the Tyrol.

63.     However, by order of November 16, 1946, the commander was to open the containers and sort the items into categories according to type of merchandise and value. After the sorting process, the determination of individual property ownership would by virtue of acts of the United States be impractical.

64.     By mixing up the property and rendering it unidentifiable as to ownership, the U.S. Army could be held blameless. Without an adequate inventory list, an owner, even if he or she recovered some items, would have no recourse in claiming that more property was due him or her.

65.     Thus ongoing investigations of previous missing property fizzled out as large quantities of gold, jewelry and watches, silver, and numismatic coins were separated and sorted.

66.     In short, there was simply no legitimate basis for the determination by United States officers that this property was "unidentifiable" or that restitution was "impracticable."

67.     Despite the evidence that the property could, in fact, be traced to its owners, the United States made no attempts to do so. The U.S. did not take action on its own, such as to publish notices in newspapers throughout Europe, the United States and Israel, nor was it willing to work with leaders of the Jewish Hungarian community that sought access to the contents of the train to identify its contents and assist others in making claims for their property.

E.    **The United States Allowed Inappropriate Disposition of the Gold Train Property**

68.     Not only did the U.S. fail to make reasonable efforts to return the property, the United States did not render an accounting or hold the property in safekeeping for its rightful owners.

1.      **Lax Security**

69.     Because of lax security, many items were stolen from the U.S. government controlled warehouses in Austria. Security problems persisted in the Property Control Warehouse in Salzburg, and concern over the warehouse's lax security practices soon extended beyond the Army. In July 1946, a State Department official warned:

> Property is now located in large warehouse at Salzburg which is not and probably cannot be adequately guarded. Strongly recommend that unless property can be promptly placed in well-guarded bank vaults it be transferred to Frankfurt. I have been informed that a certain amount of looting from warehouse has already taken place and do not see how further dissipation of property can be prevented under present conditions. Fact that no inventory exists makes almost impossible for control officers to know whether looting taking place.

U.S. government records from the time document that the gold dust and other valuables, due to a lack of security, disappeared in a burglary by military guards.

2.      **U.S. Officials Take the Property for Their Own Use**

70.     Senior U.S. military officers requisitioned property from the warehouses in Austria for their personal use in their offices and homes. On information and belief this property was never returned.

71.     After the war General Harry J. Collins was in charge of the occupation of Austria. He toured the Property Control Warehouse where the Gold Train assets were stored and immediately issued an order that large amounts of these assets be transferred to him. Collins requisitioned rugs, paintings, and other art materials from the Hungarian Gold Train for his office. He also requisitioned huge numbers of valuables for his home demanding that these items be "the very best quality and workmanship available in the Land of Salzburg." This request was initially refused by Lieutenant Colonel Homer Heller. Collins persisted and his aides proceeded to requisition property from the

BSC DOC

warehouse, removing rugs, paintings and other valuable items. He requisitioned material for his private railway car and for the decoration of his private villa.

72.     Unfortunately, this requisition of property by General Collins established a precedent for U.S. military officers to requisition thousands of items from the Property Control Warehouse for use in households, offices, and clubs.

73.     General Collins further let it be known that he was interested in providing proper quarters and household furnishings for families of the military and expected demands to be made upon property in the Property Control Warehouse.

74.     Additionally, he suggested that high-quality solid silverware be acquired by the chest and not be separated. Inscribed inside the tops of many of the chests of silver were the names of the owners, such as "Viktor Mayer." Several general officers took advantage of this interpretation of the Supply Procedure for Allowances of Household Furnishings for Dependents, Bachelor Officers and Civilians, Americans and Allies.

75.     Other high-ranking officers of the American forces in Austria used Hungarian Jewish treasures found on the Hungarian Gold Train. According to the October 7, 1999 Draft Progress Report of the Presidential Advisory Commission on Holocaust Assets on the "mystery" of the Gold Train, "General Laude received china, silverware and linen for his Salzburg home; General Hume received eighteen rugs, a table and silverware, cape linen and glassware; General Holland received nine rugs, one silver set and twelve silver plates to decorate his Vienna apartment; and Brigadier General Linden received ten rugs for his quarters on the Von Trapp estate."

### 3.     Stolen Jewish Property is Sold at Army Bases

76.     Property from the train was sold through the Army Exchange Service. The Service originally proposed sale of the property in November 1945, only six months after confiscation. At that time, the Army determined <u>not</u> to sell the merchandise in its

Exchanges in part because it believed there would be claims from the original Hungarian owners for identifiable property. As noted by one Army officer, "goods apparently are not perishable and it is believed there may be claims from original Hungarian owners for identifiable private property."

77.    Nevertheless, one year later, virtually the same plan was approved. On November 18, 1946, the Property Control Officer in Salzburg recommended that the Property Control Branch sell "the Werfen Train rugs and furs which are located in the Property Control Warehouse." The Officer defended his recommendation saying that "the property will lose a great part of its value if it is not disposed of within the next two or three months." Because it represented an asset of several thousand dollars the Property Control Officer in Salzburg wanted it to "be immediately disposed of."

78.    On November 29, 1946, the Chief of RD&R Division concurred with the recommendation to go forward with the sales:

> It is recommended by the Property Control Officer, Land Salzburg, and also by this Division that in order to realize the maximum value of the property that steps be taken at once to dispose of this property either on the Austrian open market, or by sale through the Army Exchange Service for dollar credits.

79.    The Army Exchange Service Procurement Division enthusiastically replied to this letter on December 22, 1946:

> The Army Exchange Service is very much interested in the confiscated Hungarian property stored in Salzburg, which was inspected by this office ... It was requested, from Army Exchange Service (AES) Headquarters Frankfurt, that permission to dispose of the property be obtained as soon as possible.

80.    Finally, because the United States maintained its determination that the property could not be identified as to individual ownership or national origin, the U.S. transferred much of the property to the International Refugee Organization ("IRO"). In 1947, less than two years after the U.S. took possession of the property and less than two

years after Hungarian Jews who survived the atrocities of the Holocaust were scattered throughout the world, disenfranchised from their county, their families and their possessions. The IRO determined it would auction away many of the items at the spring sale of the Parke-Bernet Galleries.

81.     In June 1948, Parke-Bernet Galleries in New York City auctioned silver, glass, china and gold objects comprising 400 catalog lots. The NEW YORK TIMES described the scene at the warehouse:

> Laid out on tables were dozens of tinted and glass cut goblets and liqueur glasses, decorative porcelain vases, bohemian cut sapphire blue and ruby glassware, Meissen, Dresden, Herend, Rosenthal, and Vienna porcelain statuettes and figure groups, Eighteenth and Nineteenth Century Continental pewter flagons and tureens . . . an estimated 22 tons is on hand, marked and unmarked, used and unused, plain and ornate, consisting of every conceivable shape of platter, tureen, tray and dish and a great quantity of candlesticks, vases and dishes, singles and sets.

Commission Report at 11.

82.     Nearly 4,000 oriental rugs, as well as cameras, microscopes, tapestries were also included.

83.     Only a fraction of what remained in the possession of the United States was auctioned. The disposition of the other property to this day is unknown.

**F.     The Fate of the Gold Train Paintings**

84.     The Gold Train also contained approximately 1200 original paintings that sat uninventoried in warehouses for over two years. The paintings were clearly part of the cultural heritage of Hungary and, therefore, under established U.S. policy, as well as post-war agreements, should have been returned to Hungary. But because of political tensions between Hungary and Austria, the U.S. government never transferred the paintings to Hungary. Instead, in early 1949, the paintings were transferred to the

custody of the government of Austria. There is no evidence that the U.S. ever even informed Hungarians about the existence of the paintings.

**G. The U.S. Refuses to Return Property Over the Vigorous Protest of Hungarian Jewish Leadership**

85.     After the war ended, the Temporary Managing Committee of Hungarian Jews sought recovery of the Hungarian Gold Train items and asked if it could send a delegation of the Central Bureau of Hungarian Jews to recover the property. These entreaties of the Hungarian Jews and the Hungarian government fell on deaf ears.

86.     Later this same leadership sought in vain to convince the Americans and the IRO not to auction the property but to return it to its rightful owners. Again the United States was unresponsive. The IRO itself stated it could not override the decision of the United States military officials that the property was "unidentifiable."

87.     Despite the requirements of international law and the acknowledgment by United States officials, including the United States Secretary of State, that the Hungarian Gold Train contained the personal possessions of individual Hungarian Jews, the United States failed to even attempt to make restitution, render an accounting or preserve the property intact for its rightful owners.

88.     The Advisory Commission on Holocaust Assets called the treatment of the assets of the Gold Train "an egregious failure of the United States to follow its own policy regarding restitution of Holocaust's victims' property after World War II." Stuart Eizenstat, a State Department official and member of the Commission, has stated many of the stolen items could be identified.

**H. Concealment and Equitable Tolling**

89.     The Hungarian Jews whose property was on the train have not been in a position to even know the disposition of their property much less mount a serious campaign to recover their valuables. A full three-quarters of the Hungarian Jews had

- 30 -

been brutally murdered by the Nazis or died of malnutrition or abuse in concentration camps. Many survivors were in ill health and had lost the majority of their families. Almost all Jews had lost their livelihood. Thousands died even after the war from malnutrition and other diseases. Others emigrated to the U.S. or Israel with only the shirt on their backs. Their country was in turmoil; their lives all but broken. The plaintiffs and their ancestors were depleted, deprived of the basic necessities of life, and in disarray. The return of their property could have helped them rebuild their lives. Instead, they were forced to rebuild their lives from scratch.

90.     Plaintiffs and other members of the class have been kept in ignorance of vital information essential to pursue their claims, without any fault or lack of diligence on their part. On information and belief, the United States never provided an accounting of the property and the U.S. and the Army have actively concealed their wrongdoing. It was only in October 1999, when the Presidential Advisory Commission on Holocaust Assets released its Report on the Gold Train, that many of the facts presented in this complaint came to light. To this day many of the facts are still concealed.

## IV.    CLASS ACTION ALLEGATIONS

91.     Plaintiffs bring this action as a class action pursuant to Rule 23(a) and 23(b)(3) on behalf of themselves and all others similarly situated, regardless of current citizenship, whose property (or the property of their family members) was confiscated by the Nazi government during Word War II, loaded on the Gold Train, ultimately seized by the U.S. military, and never returned to them and whose claims do not exceed $10,000. Included in the class are the heirs and descendants of those who owned the stolen Jewish property at the time it was taken by the Nazis.

92.     Although the exact size of the class is unknown, plaintiffs believe the class numbers in the thousands. The class is, therefore, so numerous that joinder of all members is impracticable.

FORT LAUDERDALE RSC DOC

93.     There are numerous questions of law and fact common to the class, including, but not limited to:

a.      Whether the United States seized property belonging to plaintiffs, or plaintiffs ancestors, that had been wrongfully taken from them by the Nazi Hungarian regime during the war and placed on the Gold Train;

b.      Whether the property seized was identifiable as to either individual ownership or national origin;

c.      Whether any of the property was returned to its rightful owner;

d.      Whether any of the owners were compensated for the loss of their property;

e.      Whether the United States permitted certain of the Gold Train property to be requisitioned by high-ranking United States military officers for their personal use;

f.      Whether the United States sold certain of the Gold Train property in United States military exchange stores;

g.      Whether the United States, through lax security, allowed certain of the Gold Train property to be stolen;

h.      Whether the United States permitted certain of the Gold Train property to be sold at public auction;

i.      Whether the United States gave the hundreds of original paintings from the Gold Train to the government of Austria;

j.      Whether, under principles of international law enumerated in, among other places, the Hague Convention of 1907, and United States Army Regulations, the United States held the Gold Train property as a trustee for the benefit of its rightful owners or their heirs;

- 32 -

k.    Whether the United States breached its duty as trustee of the Gold Train property;

l.    Whether the United States' possession of the property constituted an implied-in fact bailment contract under which the U.S. held the Gold Train property as a bailee for its rightful owners or their heirs;

m.    Whether the United States breached its contract of bailment by failing to return the Gold Train property to its rightful owners or their heirs, and by failing to exercise the appropriate standard of care for such property; and

n.    Whether the seizure and disposition of the Gold Train property by the United States, without compensation to its rightful owners or their heirs, constituted a taking without just compensation in violation of the Fifth Amendment to the United States Constitution.

94.    Plaintiffs' claims are typical of the claims of the class as a whole.

95.    Plaintiffs will fairly and adequately protect the interests of the class. The interests of plaintiffs are coincident with, and not antagonistic to, those of the remainder of the class. Plaintiffs have obtained counsel experienced and qualified to prosecute this action.

96.    Prosecution as a class action will eliminate the possibility of repetitious litigation, while also providing redress of claims too small to support the expense of individual, complex litigation.

97.    Class treatment is also appropriate because defendant has acted uniformly with respect to all class members.

98.    Further, the questions of law and fact common to the members of the class predominate over any questions affecting any individual member, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy between plaintiffs and defendant.

- 33 -

99.    Joinder of all class members who are geographically dispersed and number, upon information and belief, in the thousands is impracticable.  Furthermore, the expense and burden of individual litigation makes it impractical to individually redress the wrong done to them.  Upon information and belief, members of the class are not already engaged in litigation concerning this controversy.  This is a desirable forum, as it is home to a large number of class members.

### FIRST CAUSE OF ACTION – UNCONSTITUTIONAL TAKING

100.    In violation of the Fifth Amendment to the U.S. Constitution, the U.S. government took possession of plaintiffs' private property and used it for public purposes without providing any compensation to plaintiffs.  Such public use includes but is not limited to, the furnishing of military officers' homes, sale of goods in military exchanges, and funding of refugee relief organizations.

101.    At all times, the U.S. was aware that the property in question belonged to plaintiffs and the putative class.

102.    At the time of the taking, plaintiffs were Hungarian citizens without internationally recognized protection from their totalitarian government, or war refugees, with substantial connections to the United States.  As such, they were entitled to the protections of the U.S. Constitution in their dealings with the U.S. government.  Plaintiffs' close relatives were U.S. citizens.

103.    Plaintiffs' substantial connections with the United States have increased over time.  Today many of the plaintiffs are U.S. citizens.

104.    The U.S. took possession of plaintiffs' property while the property was located in Austria.  At the time of the taking, the United States was the occupying government of Austria.  The U.S. also maintained a Legation in Hungary, the home nation of the plaintiffs.

- 34 -

105.    Neither the U.S., Austria, nor Hungary were at war at the time of the taking.  The property was seized after World War II and was at no time "enemy" property.

106.    Plaintiffs and Hungarian Jews were always friendly aliens to the United States.

107.    Plaintiffs have suffered damages from the unconstitutional taking of their property.

## SECOND CAUSE OF ACTION – BREACH OF AN IMPLIED-IN FACT CONTRACT OF BAILMENT

108.    When the United States accepted possession of plaintiffs' property it did so with the express knowledge that the property belonged to plaintiffs and the putative class.

109.    At no time did the U.S. ever claim that it was the owner of the property.

110.    The U.S. took possession with the express intent of undertaking to return the property to its rightful owners.

111.    As such, the U.S. entered an implied-in-fact bailment contract for the sole benefit of the plaintiffs.

112.    The U.S. officers that assumed control of the property were at all times acting within the authority vested in them by the United States government.

113.    Under the bailment contract, the U.S. government owed plaintiffs a duty of care commensurate with the value of the property to protect the property and to return it to them.

114.    The U.S. breached its duty in numerous ways, most notably in allowing the property to be stolen, misappropriated and in other ways not returned to plaintiffs.

115.    Plaintiffs have suffered losses from defendant's breach of the implied-in-fact bailment contract.

## THIRD CAUSE OF ACTION – VIOLATION OF
## CONVENTIONAL AND CUSTOMARY INTERNATIONAL LAW

116.    It is a well-accepted principle of international law that even in a time of war, governments must respect the lives of persons and private property, and, absent exigent circumstances, private property must not be confiscated.

117.    This principle of international law is evidenced in many sources including but not limited to the Hague Convention of 1907 and the United States' own military regulations and policies.

118.    The United States came into possession of the property at issue at the end of the war and failed to return it even though peace was well-established.

119.    The United States, through its failure to return plaintiffs' property to them, has confiscated plaintiffs' property in violation of legally binding customary international law protecting the fundamental human rights of all human beings.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs request that this Court:

120.    Certify this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

121.    Adjudge and decree that defendants conduct as described herein, violated established principles of customary international law; the Fifth Amendment of the United States Constitution, and domestic law regarding the contract of bailment.

122.    Order an accounting of all property from the Gold Train otherwise disposed of by the United States government.

123.    Order the return and restitution, of any and all Gold Train Property still in the possession of the United States, including appropriate interest.

1296 19 0011 BSC DOC

124.    Award compensation to be distributed equitably among class members for the value and interest thereon of any and all Gold Train property that can no longer be traced.

125.    Award compensatory, punitive and statutory damages in amounts to be determined at trial or, where applicable, to the full extent allowed by law.

126.    Award plaintiffs the costs of bringing this action, including the payment of reasonable attorneys' fees; and

127.    Grant such other relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable as a matter of right.

DATED:  May __, 2001.

By _____
    Samuel J. Dubbin, P.A.
    Fla. Bar No. 328189
    Jeffrey L. Kravetz, P.A.
    Fla. Bar No. 435775
    DUBBIN & KRAVETZ
    Commerce Bank Center
    220 Alhambra Circle, Suite 400
    Coral Gables, FL  33134
    (305) 357-9004

    Jonathan W. Cuneo
    Joel Joseph
    David W. Stanley
    THE CUNEO LAW GROUP, P.C.
    317 Massachusetts Avenue N.E.
    Suite 300
    Washington, D.C.  20002
    (202) 789-3960

    Steve W. Berman
    Jeffrey T. Sprung
    HAGENS BERMAN LLP
    1301 Fifth Avenue, Suite 2900
    Seattle, WA  98101
    (206) 623-7292

    Attorneys for Plaintiffs

- 37 -

1599 10 001 BSC DOC