**CLOSED
CIVIL
CASE**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 01-1859-CIV-SEITZ



IRVING ROSNER; EDITH KLEIN AMSTER;        )
FRANCISC BASCH; VERONIKA BAUM; ALICE      )
BESSENYEY; ELIZABETH BLEIER; ERWIN        )
DEUTSCH; DR. JOSEPH A. DEVENYI; PETER     )
DREXLER; BARUCH EPSTEIN; MAGDA FEIG;      )
MICHAEL FRIED; PAUL GOTTLIEB; JUDITH      )
KARMI; ETHEL KLEIN; MILDRED KLEIN;        )
TAMÁS MAY; DAVID and IRENE                )
MERMELSTEIN; EDITH MORE; JOHN J.          )
RAKOS; GEORGE RASKO; ANA ROSNER;          )
GEORG MOSHE SCHWARZ, ESTATE OF            )
GEORGE SEBOK; DR. LASZLO SOKOLY and       )
EDITH REINER; AGNES V. SOMJEN; OLGA       )
STEINER; JONAS K. STERN; IRENE and        )
ANDREW TIBOR; AGNES VADASZ; and           )
ZOLTAN S. WEISS,on behalf of themselves and all )
others similarly situated,                )
                                          )
                          Plaintiffs,     )
                                          )
        v.                                )
                                          )
UNITED STATES OF AMERICA,                 )
                                          )
                          Defendant.      )
                                          )
                                          )

## FINAL ORDER AND JUDGMENT

This matter is before the Court on the Motion for Final Approval of the Class Action Settlement (the "Motion for Final Approval") **[DE 228]** and the Verified Joint Petition for an Award of Attorneys' Fees and Expenses and Motion for Modest Incentive Payments to Plaintiffs (the "Fee Petition") **[DE 212]**. On April 8, 2005, the Court issued an order preliminarily approving the Settlement Agreement[1] and scheduling a Final Fairness Hearing for September 26, 2005, to determine whether the Settlement Agreement with the United States ("Defendant") is fair, reasonable, and adequate and to determine an award of attorneys' fees and

---

[1] The Settlement Agreement's provisions are incorporated herein by reference.

expenses and incentive payments to Plaintiffs.[2]

At the Final Fairness Hearing, the Court heard argument and/or comments from Class Counsel, Defendant, the Notice Provider, interested parties, and several Class Members, either personally or through counsel. Furthermore, the Court has read and considered the Settlement Agreement, the Notice Plan, the Plan of Distribution and Proposed Detailed Plan of Allocation (the "Plan of Distribution" and "Plan of Allocation"), the Fee Petition, the Motion for Final Approval, the Declaration of Gideon Taylor, on behalf of the Notice Provider, and the objections and comments to the Settlement filed by various Class Members. Thus, upon review of these documents and all other relevant portions of the record, and for the reasons stated at the Final Fairness Hearing and as set forth below, the Court grants the Motion for Final Approval and the Fee Petition.

## I.   BRIEF PROCEDURAL BACKGROUND OF THE CASE

Plaintiffs filed their initial Complaint in this Court on May 7, 2001. The Court sustained the Complaint, in part, on August 28, 2002. After conducting extensive jurisdictional discovery, Plaintiffs then filed their First Amended Complaint on October 31, 2003. After Defendant moved to dismiss the First Amended Complaint and after Plaintiffs moved for class certification, on December 20, 2004, the parties announced that they had reached an agreement in principle to settle the case. Thereafter, on April 8, 2005, the Court preliminarily approved the Settlement, certified a settlement class, and directed notice of the settlement to the class worldwide.

## II.   BRIEF FACTUAL BACKGROUND OF THE CASE[3]

Beginning in April 1944, valuable personal property belonging to the Jewish population of Hungary was confiscated by the Hungarian government. In late 1944, a portion of the confiscated property was loaded

---

[2] Capitalized terms used in this Order have the meaning assigned to them in the Settlement Agreement, Preliminary Approval Order, and Class Notice.

[3] The Brief Factual Background is based generally upon the allegations in the First Amended Complaint.

on a train and taken to Austria where it ultimately fell into the hands of the U.S. Army on May 11, 1945. Before arriving in Austria, however, a significant portion of the valuable property from the train was off-loaded to trucks and taken to French-occupied Austria. This portion of the Gold Train Property never came into U.S. custody. The property on the train that did come under U.S. custody was placed in a warehouse under U.S. Army control in Salzburg, Austria, where some of it was "requisitioned" by senior U.S. Army officers and stolen by U.S. Army enlisted personnel and others. Subsequently, the U.S. Government claimed that the property could not be identified as to ownership or national origin, and thereafter turned the bulk of the remaining property over to the Inter-Governmental Committee on Refugees which auctioned some of the property in New York City in 1948-1949. Despite the efforts of the Hungarian Jewish community to secure the return of the Gold Train Property, none of the property was ever returned by the United States to its rightful owners. On October 7, 1999, the Presidential Advisory Commission on Holocaust Assets in the United States published its Progress Report On: The Mystery of the Hungarian "Gold Train," in which the United States, for the first time, publicly revealed its role in the receipt, handling, and disposition of the Gold Train Property.

## III.    JURISDICTION AND CLASS CERTIFICATION

This Court has subject matter and personal jurisdiction over this case and the Parties. The Court finds, and holds, that one or more of the Class Representatives has Article III standing. Thus, based on the foregoing, the Court has jurisdiction to enter a final order and judgment adjudicating the claims of the entire Class. See Newberg on Class Actions, § 2:5. at 75 (4th ed. 2002).

In addition, pursuant to Fed. R. Civ. P. 23, the following Settlement Class is certified for purposes of final settlement:

> all Persons who have claimed or at any time could claim any
> interest in the Gold Train Property, as defined in the Settlement
> Agreement, including without limitation, all Persons whose
> personal property was taken, seized, confiscated, or stolen by the
> Hungarian government and/or its officers, employees, or agents
> pursuant to Decree 1600 of 1944, Decree 8306 of 1944, or any

3

> similar law, policy, or practice, and all heirs, estates, assigns, and
> survivors of such Persons.

Moreover, for the reasons stated in the Court's April 8, 2005, Order, which are incorporated herein by reference, the Court finds that, for the purpose of the Settlement Agreement, the requirements of Fed. R. Civ. P. 23 are satisfied, and that a Class Action is an appropriate method for resolving the disputes in this litigation.

## IV.    THE SETTLEMENT AGREEMENT

Plaintiffs have presented to the Court a global settlement on behalf of all people who have claimed or in the future do claim any interest in the Gold Train Property, including all Hungarian Holocaust survivors and their heirs. The terms of the Settlement Agreement are set forth below.

### A.    The Settlement Fund

The Settlement creates a Settlement Fund of $25.5 million which shall be deposited by Defendant into an interest bearing escrow account within 30 days of Final Approval of the Settlement, including resolution of all appeals of the Final Order and Judgment. Of this amount, approximately $21 million will be disbursed as described in the Plan of Allocation, under the Court's supervision and control. The Settlement does not call for individual distributions to all Class Members as compensation. Rather, the funds will be used for the direct provision of social services and humanitarian relief to eligible Victims of Nazi Persecution who are in need as defined in the Settlement Agreement. The Special Fund will be allocated to countries pro rata based on Professor Randolph Braham's estimate of the numbers of Hungarian Holocaust survivors residing in each particular country today.[4]

### B.    Non-Monetary Benefits

In addition to the monetary distributions through humanitarian and welfare agencies, the Settlement contains substantial non-monetary relief which will benefit all Class Members. For example, $500,000 from the Settlement Fund shall be designated for an entity chosen by a panel of experts to collect papers and

---

[4] In addition to the creation of the Settlement Fund, the Defendant also agreed to bear all costs of notice to the Class up to $1 million.

materials related to the receipt, handling, and disposition of the Gold Train Property. Moreover, the Settlement also calls for an acknowledgment from the United States relating to its role in the handling of the Gold Train Property.

## V.    CLASS NOTICE AND SETTLEMENT ADMINISTRATION

On April 8, 2005, the Court approved the Notice Plan. That plan, as the Court has found, See April 8 Order at 14-15, comports with all the requirements of applicable law, Rule 23, and due process. See Declaration of the Notice Provider, filed on or about September 15, 2005; Submission of Claims Conference Comments on Items to be Considered at the Final Fairness Hearing on September 26, 2005, filed on or about September 23, 2005.

Specifically, on or about May 2, 2005, the Notice Provider sent by direct mail to over 49,600 individual addresses a copy of the Long-Form Notice. These 49,600 individuals reflect all members of the Settlement Class for whom the Notice Provider and Class Counsel possessed addresses (or whose addresses were reasonably obtainable). Additionally, there were approximately 825 re-mails of notices returned by reason of an incorrect address. Notice was also be given by publication in 25 countries in 125 different publications. According to Professor Braham, the countries where notice was published are the countries where eligible victims and other Class Members are reasonably believed to reside. See Braham Report, attached to Plan of Distribution, Exhibit B to Settlement Agreement. Additionally, a multi-language website provided Class Members with notice of the Settlement, the Settlement Fund, the Special Fund, the Plan of Allocation, the Non-Monetary Relief, the date of the Fairness Hearing, the requested attorney fees and incentive awards, and other essential information that would enable a Class Member to make an informed decision regarding his or her rights. Moreover, the Notice Provider manned specified 1-800 numbers (or the international equivalent thereof) to answer questions and provided additional written materials (including the

Court-approved FAQ) to an additional 3,500 individuals.[5]

Thus, the Court finds that the published notice, direct mailing of notice, and Internet posting constituted the best notice practicable under the circumstances regarding the Settlement, Class Counsel's Fee Petition, the Plan of Distribution and Plan of Allocation, the date of the Fairness Hearing, and other matters set forth in the Class Notice and the Summary Notice. The notice constituted valid, due, and sufficient notice to all members of the Settlement Class, and complied fully with the requirements of Fed. R. Civ. P. 23(c)(2)(B), the Constitution of the United States, and other applicable laws.

## VI.    OPT-OUTS AND OBJECTORS

Under the Settlement Agreement, any persons who wished to be excluded from this Settlement were provided a 90-day opportunity to "opt out" pursuant to the Notice, which was executed in accordance with the Court's direction and Order.  The Court finds that those individuals whose names (a total of 100 Nazi Victims and 62 Heirs ) are listed in Exhibit A to this Final Order and Judgment have validly excluded themselves from this Action, and accordingly, they have no rights under the Settlement Agreement, and shall not be bound by either the Settlement Agreement or the final judgment herein.   Despite the number of Nazi Victims who excluded themselves from the Settlement, Defendant has chosen not to exercise its rights to withdraw from or reduce its cash payment to the Settlement Fund under Paragraph XI of the Settlement Agreement.[6]

In addition, the Court received a total of 356 objections to the Settlement.  Any Class Member who did not timely file and serve an objection in writing to the Settlement Agreement, or to Class Counsels' Fee

---

[5] In addition, the Court notes that the Notice Provider generated additional notice through earned media, organizational outreach, and e-mail bulletins, and that Class Counsel and the Plaintiffs provided further notice through their efforts to meet and speak with the media and other potential Class Members.

[6] The Court has reviewed the Request to Reject the Joint Motion for Order of the Plaintiffs and the Defendant and to Confirm the Rejection of Settlement by the Members of the Organization for the Assertion of Rights of Hungarian Jews filed by Mr. Barak Ben-Amos, Chairman of the Organization for the Assertion of Rights of Hungarian Jews.  For the reasons stated in the parties' Joint Motion for Order Addressing Certain Correspondence Received by Notice Provider and the Court's September 12, 2005, Order, Mr. Barak Ben-Amos *only* is excluded from the Settlement.

Petition, in accordance with the procedure set forth in the Class Notice and mandated in the Preliminary Approval Order, is deemed to have waived any such objections by appeal, collateral attack, or otherwise.

## VII.    STANDARD OF REVIEW

The settlement of a class action requires court approval. Fed. R. Civ. P. 23(e).  The Federal Rules of Civil Procedure contemplate a multi-step process for approving a class settlement.  The Court is now at the second stage in that process, as the Court already made a preliminary fairness determination, found that the settlement class satisfies the requirements of Rule 23 and certified the class, and approved the dissemination of notice, which has occurred.  In this step, the Court must determine whether the interests of the Class will be better served by the proposed resolution or by continuation of the litigation.

There is an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex.  Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977);[7] Ass'n for Disabled Ams., Inc. v. Amoco Oil Co., 211 F.R.D. 457, 466 (S.D. Fla. 2002).  A class action settlement should be approved so long as it is "fair, adequate and reasonable and is not the product of collusion between the parties."  Bennett v. Behring Corp., 737 F.2d 982, 986 (11th Cir. 1984).  Moreover, where the settlement previously has been preliminarily approved, the settlement is "presumptively reasonable," and an objector must overcome a "heavy burden" to prove the settlement is unreasonable.  Williams v. Vukovich, 720 F.2d 909, 921 (6th Cir.1983) (citations omitted).  In determining whether the settlement is fair, adequate, and reasonable, the Court must consider all relevant factors, including (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate, and reasonable; (4) the complexity, expense and duration of the litigation; (5) the substance and amount of opposition to the settlement; and (6) the state of proceedings at which the settlement was achieved.  Bennett, 737 F.2d at 986; Cotton, 559 F.2d at 1330-31.

---

[7] The Eleventh Circuit, in the en banc decision of Bonner v. Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as precedent all decisions of the Fifth Circuit rendered before October 1, 1981.

7

In evaluating these considerations, the Court must not try the case on the merits. Cotton, 559 F.2d at 1330. Rather, the Court must rely upon the judgment of experienced counsel and, absent fraud, "should be hesitant to substitute its own judgment for that of counsel." Id. (citation omitted). In evaluating a settlement's fairness, "it should [not] be forgotten that compromise is the essence of a settlement. The trial court should not make a proponent of a proposed settlement 'justify each term of settlement against a hypothetical or speculative measure of what concessions might [be] gained.'" Id. (quotation omitted). Moreover, a small number of objectors from a plaintiff class of many thousands is strong evidence of a settlement's fairness and reasonableness. See id. at 1331. "Above all, the court must be mindful that 'inherent in compromise is a yielding of absolutes and an abandoning of highest hopes.'" Ruiz v. McKaskle, 724 F.2d 1149, 1152 (5th Cir. 1984) (quoting Cotton, 559 F.2d at 1330).

## VIII.   ANALYSIS

As discussed below and at the Final Fairness Hearing, a review of the relevant factors leads to the conclusion that this Settlement is fair, reasonable, and adequate and is not the product of overreaching by, or collusion between, the negotiating parties. Therefore, the Court grants the Motion for Final Approval.

### A.   All Relevant Factors Weigh In Favor Of Approval

1.   The likelihood of success at trial: The strength of the case and the risk, expense, complexity and likely duration of further litigation militate in favor of final approval

The parties vigorously disputed the factual and legal merits of the instant case, and thus the uncertainties and litigation risks weigh strongly in favor of a finding that the Settlement is fair, adequate, and reasonable. Indeed, Plaintiffs faced considerable risks with respect to Defendant's 12(b)(6) arguments in their Motion to Dismiss as well as with class certification for litigation purposes. Thus, the uncertainties of litigation and the risk of not certifying a litigation class weigh in favor of a compromise settlement. See West Virginia v. Chas. Pfizer & Co., Inc., 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970) ("It is known from past experience that no matter how confident one may be of the outcome of litigation, such confidence is often misplaced."), aff'd, 440 F.2d 1079 (2d Cir. 1971).

8

Additionally, avoiding the delay and risk of protracted litigation is itself a legitimate reason for counsel to recommend, and the courts to approve, a settlement. Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968). This is especially true in this case, as many Class Members are elderly and infirm and in need of the benefits offered by the Settlement now. After already four years of pre-trial motion practice and jurisdictional discovery, it is difficult to imagine that the Class Members would have obtained a significantly greater recovery at trial, and to the extent one might be obtained, the expense of doing so would be great. Further, the voluminous record and the papers and pleadings already developed in this case speak loudly to the likelihood of added layers of complexity and the concomitant time required to press the case all the way to trial.

Lastly, had the matter gone to trial, additional post-trial appeals likely would have delayed recovery and thereby reduced the benefits of an ultimate victory for the Class, many of whom are elderly and in need of money, closure, and a historical reckoning now. Thus, in the end, the value of the Settlement is enhanced greatly by the fact that the relief will be provided to Class Members now, without the delay, burden, and risks of further litigation. This factor weighs heavily in favor of final approval.

> 2.    $25.5 million is a reasonable recovery for the value of the property on the Gold Train when the United States accepted custody

With respect to the second factor, the Court finds that the Settlement provides substantial monetary benefits and is therefore a reasonable recovery. Although there have been many widely-varying estimates of the value of the property on the Gold Train, both contemporaneous and recent, the fact is that no inventory was ever made of the property, much less a detailed appraisal, and therefore any estimate of value is somewhat speculative. According to Plaintiff's expert, Gábor Kádár, the value of the train at the time the U.S. obtained custody was approximately $4.5 to $9 million dollars, or approximately $45 to $90 million today. Taking the mid-point of his range, or $67.5 million, the Settlement represents a return of more than 37% of the total value

9

of the property on the train at the time the U.S. obtained custody.[8]   Such a settlement is fair and reasonable. See Behrens v. Wometco Enters., Inc., 118 F.R.D. 534, 543 (S.D. Fla. 1988) (approving settlement of 5.7% desired recovery); Strube v. Am. Equity Investment Life Ins. Co., 226 F.R.D. 688, 698 (M.D. Fla. 2005) (approving settlement equal to 2% of estimated potential recovery).[9]   Accordingly, given the substantial factual and legal hurdles that Class Members needed to overcome before any recovery, the discounted compromise figure of $25.5 million represents a fair and reasonable, indeed outstanding, result.

> 3.    The reaction of Class Members indicates overwhelming approval for the Settlement

A vast majority of Class Members have expressed a willingness to approve the Settlement, which weighs heavily toward this Court's decision to approve the settlement.   Cotton, 559 F.2d at 1331 (holding that a small number of objectors from a plaintiff class of many thousands is strong evidence of a settlement's fairness and reasonableness).   In a class numbering approximately 60,000 Victims of Nazi Persecution (as defined in the Agreement) and tens if not hundreds of thousand additional heirs, approximately 100 victims of Nazi persecution and 62 heirs timely requested exclusion and only 356 separate objections were received by the Notice Provider.   Accordingly, this factor also weighs heavily in favor of final approval.

> 4.    The stage at which Settlement was obtained:  The extensive independent and formal discovery conducted by Class Counsel indicate that Counsel was well-versed and sufficiently informed to enter into this Settlement

Class Counsel negotiated the instant Settlement with wide knowledge of the relevant facts and law. See generally Decl. of Jonathan W. Cuneo in Support of Fee Petition.   Indeed, the Settlement was only reached after four years of litigation, including extensive jurisdictional discovery. The fact that Class Counsel was well acquainted with the facts and law, the strengths and weaknesses of the case, and had undertaken

---

[8]   Moreover, according to Defendant, the recovery here might come close to 100%.   See e.g., Letter from Daniel Meron to Moshe Sanbar, July 11, 2005 (noting that most of the property the U.S. obtained was auctioned for approximately $2.17 million (1948 dollars), or $21.7 million in today's dollars).

[9]   For the same reasons, the Court rejects the arguments of certain objectors that contend that the settlement amount was insufficient. See e.g. Objectors/Commentators Nos. 10, 11, 20, 48, 132, 154, 179, 255, 297, and 298.

substantial discovery, strongly supports the conclusion that the Settlement is fair and reasonable.

       5.     Good faith, arms-length negotiations between experienced counsel and the absence of collusion also support final approval of the Settlement

As noted above, courts also examine the process by which a class action settlement was reached in order to determine that it was not the product of fraud or overreaching by, or collusion between, the negotiating parties. Cotton, 559 F.2d at 1330. Here, the absence of evidence that the Settlement is the product of anything other than arm's-length negotiations among counsel for the parties, and was not the product of collusion or any improper influences, clearly supports approval of the Settlement as final. See September 23, 2005, Letter from Mediator Fred F. Fielding. In point of fact, the Settlement was reached only after intensive negotiations conducted over the course of several months, extensive document discovery, and expert consultations that refined the parties' respective assessments of the risks of the litigation. See Preliminary Approval Memorandum at 8; Decl. of Jonathan W. Cuneo in Support of Fee Petition ¶¶ 77-90. Until the settlement papers were finally signed, counsel for both parties zealously represented their clients' interests every step of the way. Accordingly, the non-collusive negotiation and advantageous Settlement obtained also strongly militate in favor of final approval.

**B.    No Objection Establishes That The Settlement Is Anything But Fair And Reasonable**

Although the Court preliminarily approved the Settlement, and though the Settlement is presumptively reasonable, under Rule 23 class members have a right to object and/or comment on the settlement and try to convince the Court otherwise, if they are so inclined. After reviewing the approximately 356 objections, however, the Court finds that the Settlement is fair and reasonable.

       1.     The lack of direct payments to all Class Members does not render the Settlement unfair as a cy pres remedy is proper

The most prevalent objection made by Class Members is that individuals should receive direct payments, rather than have the funds distributed for the benefit of Hungarian Nazi victims in need through

designated social service agencies.  This objection is mentioned by more than 300 of the 356 objections,[10] and is by far the principal objection asserted.  Some of the objectors urged that they be compensated for all of the specific property that they lost, while most recommended that the funds be divided equally and distributed pro rata to each Hungarian survivor.  Though this objection has strong emotional and logical attraction, the failure to include individual payments as part of the Settlement does not render it legally unfair or unreasonable.

  a. *Compensation for Specific Property*

  The question of which Class Members might receive a direct payment is a complex question without an easy answer.  Some of the objections urged direct compensation "for those who possess official documents."  See e.g. Objections/Comments Nos. 125, 140, 189, 307.  The shortcoming to this process is that it penalizes those who after 60 years lack documentation.  Given the horrific hardship and dislocation suffered by those who survived the Holocaust, requiring such documentation to share in the proceeds of the Settlement justifiably would invite a large degree of fair criticism.  Furthermore, to complicate the issue, Decree 1600 receipts and other forms of official documentation do not necessarily evidence that the property was on the Gold Train when the U.S. obtained custody.  Thus, possession today of such documentation does not, by itself, differentiate those who had property on the Gold Train when the U.S. accepted custody from those who did not.

  Finally, the last, and perhaps most glaring problem with this process is that according to Plaintiffs' experts, most if not all of the Decree 1600 receipts issued are still retained in the Hungarian archives; an archive that has severely restricted access.  See Affidavit of Gábor Kádár ¶66.  Therefore, giving priority (either in order of payment or amount) to victims who could produce receipts today, or who had other

---

[10] See e.g. Objections/Comments 1, 2, 4-8, 11-19, 21-25, 27-30, 32-47, 49-60, 62-68, 72-73, 75-108, 111, 113-124, 126-133, 135-138, 140-143, 146-150, 152-161, 166, 168, 172-182, 184-201, 203-213, 215-228, 230-240, 243-248, 250-268, 270-300, 302-306, 308-315, 318-327, 329-330, 333-335, 337-340, 342-344, 346-348, 350, 354-356.

contemporaneous evidence of their families' belongings in Hungary, would make recovery under the Settlement too dependent on the happenstance of record availability, and under the circumstances would be unjust.

> b.   *Equal Payments To All Class Members*

Perhaps recognizing the shortcomings of relying on documentation, other objectors – indeed most objectors – argued for a process of equal payment to each Class Member. While this option has the appearance of simplicity and ease of administration, upon closer scrutiny this approach in a case based upon a bailment theory is problematic. For example, Class Members include heirs who are theoretically entitled under the law to share in any restitution given for property unlawfully taken from their fathers and mothers. Unfortunately, however, the cost of ascertaining who is entitled to payment under the laws of inheritance might well deplete the Settlement Fund or result in mere token payments to Class Members, and/or take years to accomplish. See In re Holocaust Victim Assets Litig. ("Swiss Bank"), 2005 WL 2175955 (2d Cir. Sept. 9, 2005) (citation omitted) (noting that a cy pres allocation was proper because a case-by-case valuation of claims to the looted assets "would have resulted in an unwieldy and enormously expensive apparatus," and "[a] pro rata distribution would have resulted in the payment of literally pennies to each of the millions of individuals who would fall into' the Looted Assets Class.").[11]

Indeed, the overwhelming proportion of the Class supported the choice made and the Settlement. The rationale was eloquently expressed by Mr. Rosner, Mr. Moskovic, Mr. Schwarz, Mr. Rubin, and Mr. Mermelstein who addressed this Court at the Preliminary Approval Hearing. The prevailing view of Plaintiffs and other members of the Settlement Class, including heirs, was that this cy pres distribution would provide more meaningful benefits than one that delivered a truly token and trivial amount to all. As Irving Rosner

---

[11] In addition, this objection assumes that $25.5 million is available to distribute. However, the United States has made clear that it was not necessarily prepared to offer such amount of money if the parties utilized a different allocation method. *See* Tr. from September 26, 2005, Final Fairness Hearing ("Final Fairness Hearing Tr.") at 79 (stating, "there is no basis for an assumption that the amount would have been 25 million had this been a pro rata distribution as opposed to one that is for the benefit of the needy survivors").

explained:

> We are satisfied that this settlement with the United States is the kind of result that
> many of us needed. I hope that the funds from this settlement will be distributed as
> fast and efficiently as possible. There are too many Holocaust survivors alive today
> who cannot take care of themselves with their own resources. That is why I support
> the settlement so Hungarian survivors can get much-needed help before it is too late.
> Many of us do not need the help, Your Honor, and are glad to see that the funds will
> be used for those who are truly in need today or will slip into this condition. Given
> the difficulties of the case and the time it would take to continue, we believe this
> outcome does the most good for the class.

See Tr. from March 17, 2005, Preliminary Approval Hearing ("Preliminary Approval Hearing Tr.") at 19.

In sum, considering all of the practical problems and proof problems associated with direct payments,
as well as the indignity associated with token payments, the Plan of Allocation is a fair and reasonable method
of achieving a meaningful payment with the Settlement Funds. Indeed, the Settlement and the negotiated Plan
of Allocation is fair, and in the best interests of the class as a whole.

2.     Objections to $500,000 for archival purposes do not indicate that the Settlement is
unfair

A small number of Class Members objected to use of any funds for the creation of an archive to
document the Gold Train episode. As Plaintiffs explained at length in their Preliminary Approval
Memorandum, the archive to be created from this case advances in a vital way the Plaintiffs' goals of
obtaining a historic reckoning of the United States' conduct in regard to the Gold Train. The Class Members
who spoke at the Hearing on Preliminary Approval also mentioned the significance of this archive.[12] See
Preliminary Approval Hearing Tr. at 17, 24. Moreover, there is no evidence or precedent to suggest that

---

[12] As Mr. Schwarz stated:
I support this settlement to honor my family's memory and the memory of the Hungarian Jews who
suffered so much, to assist those who survived but find themselves in need, and to benefit those
who were not there but should not forget. The archiving and dissemination of information about
the Hungarian Holocaust is vitally important. . . . I do not wish to receive any monetary gains. All
I want is that the proceeds of this settlement will assure the historical truth about the participation
of various nations in my people's tragedy, so when we say NEVER AGAIN, those words will bear
their full meaning, weight and warning, and will resonate around the world to people of all races
creed and color.
See Declaration of Georg Moshe Schwarz, March 16, 2005, at 5.

14

attributing $500,000 of this Settlement toward an archival endeavor is unfair or unreasonable.  To the contrary, the Swiss, Austrian, and German Holocaust settlements all devoted settlement funds to the enhancement of the historical record or creation of lasting memorials for the victims of the dead, or for education of future generations about the Holocaust.[13]   Here, the $500,000 set aside for such a purpose is reasonable.

> 3.     Objections to any Claims Conference involvement in the administration of the
>        Settlement do not illustrate any unfairness

There are approximately four objections to the Claims Conference's playing any role in the administration of the Settlement Fund.  These objections state that the Claims Conference is irresponsive to the needs of victims and that the Settlement Fund will be used to pay administrative expenses.  See e.g. Objection No. 3.  The Plan of Allocation, however, identifies the specific agencies through which the settlement benefits will be distributed; specifies the exact amounts that each agency will have at its disposal; explains that a local Advisory Committee will determine which humanitarian and/or emergency needs grants submitted by eligible victims will be honored; provides for annual reports of expenditures; allows Class Counsel to seek an audit of the Special Fund's administration; and places the organization under the jurisdiction of this Court, which is empowered to address any problems that may arise.  Thus, these objections do not demonstrate that the Settlement is either unfair or unreasonable.

---

[13]   In the Swiss Bank case, for example, the court approved an allocation of $10 million for the creation of a "victim list" through Yad Vashem to augment the existing database of Jews who perished in the Holocaust.  See 2005 WL 2175955, at *5 n.11.  The German Foundation Agreement provided DM 700 million for a "Future Fund" for education and remembrance projects to be determined by the German Foundation Trustees.  See In re Nazi Era Cases Against German Defendants Litig., 198 F.R.D. 429, 434 (D.N.J. 2000).  The Austrian Bank settlement provided for $2 million for an archive.  In re Austrian and German Bank Litig., 80 F. Supp.2d 164, 170 (S.D.N.Y. 2000).

15

4.     Objections to percentage distributions contained in the Plan of Allocation

Two objectors ask the Court to reallocate a portion of the Special Fund so that Nazi victims in Hungary receive a greater share than was agreed to by the parties. See Objections Nos. 242 & 252.[14]  Both contend in general terms, and without any supporting evidence or documentation, that the population of Nazi victims in Hungary are "needier" than those living in the United States and Israel. These objections will hereafter be referred to as "Reallocation Proposals."

Initially it must be noted that the Reallocation Proposals do not call into question the underlying fairness of the settlement, but rather suggest an alternate method for distributing the Settlement Fund among the relevant countries.[15]  First, Moshe Sanbar proposes re-allocating 10% of the Settlement Fund, or approximately $2.1 million, to Hungary. See Objection No. 242.  This number, however, is not based upon any evidence, but rather was negotiated between the Confederation of Holocaust Survivors in Hungary, the Federation of Jewish Communities in Hungary, and the Association of Former Hungarian Jews in Israel under Mr. Sanbar's skilled leadership and guidance. See Final Fairness Hearing Tr. at 20.  Similarly, Burt Neubone, on behalf of eleven class members residing in Budapest, objected to the "flawed allocation formula" that "should be modified to account for the disproportionately high concentration of needy class members in Hungary." See Objection No. 252. Mr. Neuborne initially suggested that the Court order the Notice Provider to conduct an investigation into the economic circumstances of the Class Members, as such information is not currently available, in order to determine the appropriate redistribution.  However, as he did not know with any degree of certainty the time or costs associated with his proposed investigation, and because he did not want to delay the settlement, Mr. Neuborne later supported the proposal of Mr. Sanbar. See Final Fairness Hearing Tr. at 37.

_____

[14]  Additionally, objections 171 and 323 argue that the Settlement should all go to Hungary, but do so for reasons that seem to misapprehend that the case is on behalf of the owners of the property who reside world-wide.

[15]  As stated by Moshe Sanbar at the Final Fairness Hearing, "I cannot challenge the fairness of the agreement because I was an initiator here." Final Fairness Hearing Tr. at 14.

There are multiple problems with both Mr. Neuborne's initial proposal and the 10% re-allocation plan suggested by Mr. Sanbar. First, as to Mr. Neuborne's initial proposal, Mr. Neuborne himself conceded that, "this is not a case where you want to spend scarce funds doing a person-by-person survey and census of every poor Hungarian victim around the world. That would be . . . an inefficient use of scarce funds." See id. at 38. Indeed, the Court finds that the time and costs associated with requiring an investigation into the economic status of the Class Members would outweigh any benefits to be gained by the Class Members living in Hungary.[16]

There are similar problems with Mr. Sanbar's 10% re-allocation plan. First, although Mr. Sanbar urges the Court to adopt his proposal, the Court cannot re-write the terms of the Settlement Agreement negotiated between the parties; rather, the Court's only option would be to condition its approval of the Settlement upon the parties' adoption of the 10% re-allocation plan. Thus, Mr. Sanbar's objection fails to consider the real possibility that the parties would not agree to such amendment. See Statement of Daniel Meron, Final Fairness Hearing Tr. at 83 (stating, "Now, I don't know what we would have done as a government if this would have been presented to us before we had an agreement, as we were negotiating the agreement."). Second, the Court hesitates to adopt a proposal not based on an evaluation of need, but on a percentage that was negotiated without the input of Class Counsel or Defendant, as such a plan would be vulnerable to intense criticism from the adversely affected members of the Class.

Finally, and perhaps most significantly, if the Court were to adopt Mr. Sanbar's plan, it would be required to provide re-notice to those Class Members adversely affected by the change, which is approximately 77% of the Class. See Nilsen v. York County, 382 F. Supp. 2d 206, 221 n.9 (D. Me. 2005) (stating, "[i]f the parties decide to amend the settlement to remove the cause for my disapproval, I would

---

[16] In addition, as discussed in the Final Approval Motion, any study designed to determine the "relative neediest" among the needy would be difficult, if not impossible, and fraught with subjectivity. At a minimum, such a study would have to take into account the cost of the specific services that would be subsidized by the Special Fund in each country, the kind, quality, and universal availability and utilization of social safety nets in the various countries, the general cost of living, currency exchange rates, and the like.

require a new opportunity for female class members who have filed claims to opt out. . . . I would require notice of the amendment and the opt-out right only to female class members who have already filed claims, because they are the only class members who would be negatively affected by such an amendment."); White v. Nat'l Football League, 836 F. Supp. 1458, 1468-69 (D. Minn. 1993) (requiring re-notice to those class members adversely affected by an amendment to the settlement agreement).  Thus, in order to provide approximately $2.1 million dollars of additional social services to Class Members living in Hungary, the Court would first have to provide for re-notice and a second opt-out period, which would not only be costly and delay the ultimate distribution of the Settlement Fund to the Class, but could also potentially defeat the entire Settlement.  As expressed by Class Counsel, "[n]ow, any rejection of the settlement could . . . make the process go backwards.  We could lose, to the extent we have a consensus, that which we have. . . . And, of course, the consensus that we have been able to build so far has been very difficult, it has been fragile."[17] Final Fairness Hearing Tr. at 107-08.  Thus, although Mr. Sanbar's proposal has appeal, the Court finds that it would be unfair and unreasonable to require the parties to adopt it at this stage of the proceedings.

In addition to the costly problems associated with the Reallocation Proposals, the Court finds that the current allocation system, based upon population, is fair and reasonable, as it is consistent with Plaintiffs' theory of the case.[18]  As the gravamen of the First Amended Complaint is essentially a property claim, the parties chose to allocate the Settlement Fund equally among all living Class Members today.  Notably, other courts have adopted cy pres allocations based on population proxies designed to benefit class members when individual damage determinations are too difficult or too costly.  See West Va. v. Chas. Pfizer & Co., 314

---

[17] Indeed, it is not even clear whether all of the named Plaintiffs would approve of an amended Settlement, as a number of them spoke eloquently at the Final Fairness Hearing in favor of the Settlement in its current form.

[18] That the Second Circuit approved the trial court's discretionary use of a different formula proposed by a Special Master in the Swiss Banks case does not compel a different result than the one agreed to by the Parties and preliminarily approved by this Court on April 8, 2005.  While the Second Circuit did express dissatisfaction with an allocation system based upon population, the factual and procedural posture of that case varies greatly from the issues pertinent here.

18

F.Supp. 179, 185 (S.D.N.Y. 1970), aff'd, 440 F.2d 1079(2d Cir. 1970) (allocating an anti-trust settlement pro rata among the states); In re Toys "r" Us Antitrust Litig., 191 F.R.D. 347 (E.D.N.Y. 2000) (distirbuting settlement funds uniformly throughout the country for toys and educational programs). Moreover, none of the allocated money will go to waste under the Plan of Allocation, as there is tremendous need all over the world. In fact, the Court has before it proof that the funds allocated from the Settlement will, at best, address only a portion of the needs of eligible Hungarian Nazi Victims in the United States, Hungary, Israel and the rest of the world.[19]

In addition, the Plan of Allocation itself provides for an internal process for annual reconsideration of the allocations made to the various agencies in specific locales.  Funds are allocated to agencies on an annual basis.  If any funds remain after the annual allocation period, they are canceled.  "In such an event, recommended allocations will be reviewed and may be adjusted; should that be necessary, a supplemental Detailed Plan of Allocation will be presented" to the Court for its review and approval. See Plan of Allocation, at 5.  Thus, should the facts bear out that some of the money cannot be used in one locale because there is not sufficient need among eligible victims, those monies will be reallocated but done so with Court approval and proof that the money is not in fact needed in the particular locale. Thus, the Settlement and Plan of Allocation contemplated and provided for a method of addressing the concerns raised by the Reallocation Proposals.

Finally, to the extent that it is even applicable, the Court finds that the Settlement does not violate Amchem Prods. v. Windsor, 521 U.S. 591 (1997), as there is no evidence to suggest that Class Counsel subordinated the needs of Class Members living in Hungary to the interests of Class Members living in other countries. First, the Confederation of Holocaust Survivors in Hungary, the Federation of Jewish Communities

---

[19] See e.g. Letter from Stuart E. Eizenstat to the Honorable Edward R. Korman, December 30, 2003, attached as Exhibit A to Declaration of Samuel J. Dubbin in Support of Plaintiffs' Motion for Final Approval of the Class Action Settlement and Supporting Memorandum of Law ("Dubbin Declaration"); Declaration of David Saltman, Jewish Community Services of South Florida (Miami-Dade County programs) and Ken Moskowitz, Jewish Family Services, Inc. of Broward County, Florida, Exhibits B and C to Dubbin Declaration; Submission of United Jewish Appeal/Federation of New York City to Swiss Bank Special Master, Exhibit F to Dubbin Declaration; and Brodsky and Della Pergola study, Exhibit E to Dubbin Declaration.

in Hungary, and the Association of Former Hungarian Jews in Israel all participated in the mediation through counsel.  Furthermore, no objector has suggested that the 10% allocation plan was suggested during the mediation process.  See Objections 242, 252; Final Fairness Hearing Tr. at 111.  Third, although the parties did not select an allocation method that will favor Hungary over the other countries, Class Members living in Hungary will receive approximately $900,000 a year in financial assistance under the Settlement, which is a greater amount than that achieved under any other Holocaust restitution case.  See Final Fairness Hearing Tr. at 114.  Accordingly, upon careful consideration of the objections and the oral argument of the Objectors, the Court finds that the current Plan of Allocation is fair, reasonable, and not the product of collusion.

## IX     FEE REQUEST

Class Counsel seeks an award for fees and reimbursable expenses of $3.85 million.  When expenses are deducted, the fees requested represent less than 12% of the total monetary value of the Settlement, which is far below the Eleventh and Federal Circuits' standards for awarding attorneys fees in common fund class actions.  Class Counsel litigated this case against a highly sophisticated and extremely powerful adversary with vast resources and an impressive arsenal of legal defenses not available to all defendants.  It took five years of determined and creative lawyering before a settlement could be reached.  Considering the extraordinary time and effort expended by Class Counsel, the difficulty of the case and the risks undertaken, the fact that not a single lawyer stepped forward to assist Class Counsel on a pro bono basis or at reduced-fee rates, as well as the quality and historical importance of the results, the fees requested are amply supported.[20]  Accordingly, the Court confirms the appointment of Class Counsel and finds that Class Counsel have fairly and adequately represented the interests of the Class.  In addition, for the reasons set forth herein and articulated at the Fairness Hearing, the Court finds that attorneys' fees and expenses in the amount of $3.85

---

[20]  For the same reasons, and given that there is extremely minimal opposition to Counsel's fee request among the over 60,000 class members, the Court finds that this objection does not render the Settlement either unfair or unreasonable.  See  Objections Nos. 16, 34, 96, 211, 230, 246, 294, and 347 (suggesting that the attorneys' fees are too high).  But see Objections/Comments Nos. 25, 67 & 138 (commenting on the high quality of legal work).

million is fair and reasonable.

Turning to the request for modest incentive awards, the Court finds that such request is also fair and reasonable. Incentive or service awards, such as those sought here, are readily approved by courts within the Eleventh Circuit. As one district court recently noted, "Courts routinely give incentive awards to compensate named plaintiffs for the services they provide and the risks they incurred during the course of the class action litigation." Ingram v. Coca-Cola Co., 200 F.R.D. 685, 694 (N.D. Ga. 2001) (citation omitted) (approving incentive award payments of $300,000 per representative, and $3,000 per non-representative class member who provided affidavit). Here, based upon the information submitted by Class Counsel, and noting that no objections were filed, the Court finds that the modest incentive awards requested for certain Plaintiffs are fair, reasonable, and appropriate.

## X.   CONCLUSION

Based upon the foregoing reasons, as well as the oral findings of fact and conclusions of law reflected in the transcript of the Final Fairness Hearing on September 26, 2005, as well as the arguments made in Plaintiff's Final Approval Motion and Class Counsel's Fee Petition, it is hereby

ORDERED that

1.      The Final Approval Motion **[DE 228]** is GRANTED. The Settlement Agreement, including the Plan of Distribution and Plan of Allocation, is a fair, reasonable and adequate compromise of the claims against the Defendant in the Action, pursuant to Fed. R. Civ. P. 23.   Judgment is entered dismissing the claims except to the extent of the relief provided in the Settlement Agreement, which is incorporated herein by reference.

2.      Defendant and Settlement Class Members are bound by the Settlement Agreement, including all releases contained therein, and this Final Order and Judgment, and Settlement Class Members do not have any further opportunity to exclude themselves from the Action.

3.      All Class members who have not timely filed a Request for Exclusion are permanently barred

21

and enjoined from commencing and/or prosecuting any Settled Claim against the Defendant in any forum.

    4.    Class Counsel's Petition for attorney's fees **[DE 212]** is GRANTED. The fees and expenses requested by Class Counsel are approved in the total amount of $3.85 million and the Escrow Agent is directed hereby to pay such fees and expenses from the Settlement Fund to Cuneo Gilbert & LaDuca, LLP, which shall allocate such fees and expenses to other Class Counsel in a fair and equitable manner.

    5.    The Plaintiffs are awarded incentive payments totaling $150,000, as set forth on the Schedule of Plaintiff Incentive Payments, attached hereto as Exhibit B, in recognition of the efforts they have undertaken and the risk they have incurred in connection with this Action. The Escrow Agent is hereby directed to make such payments to the said Plaintiffs from the Settlement Fund.

    6.    Without affecting the finality of this Final Order and Judgment, this Court shall retain exclusive and continuing jurisdiction over the Action, all Parties, the Claims Conference and Settlement Class Members, to interpret and enforce the terms, conditions and obligations of this Final Order and Judgment, including all matters relating to the consummation, performance, and enforcement of the Settlement Agreement.

    7.    Class Counsel may move this Court for any Order necessary to implement this Judgment or the Settlement Agreement or to assist in the administration of the Settlement Agreement.

    8.    Pursuant to the Settlement Agreement, the Settlement Fund and Special Fund shall be maintained by the Escrow Agent under the continuing jurisdiction and supervision of the Court and shall earn interest, which shall become part of the Special Fund.

    9.    For administrative purposes, this case is CLOSED.

DONE AND ORDERED in Miami, Florida this 30ᵗʰ day of September, 2005.

 

Patricia A. Seitz
United States District Court

cc:
Counsel of Record

22

**Exhibit A**

**List of Individuals Excluded from the Settlement**

| | |
|---|---|
| 1 | MOSHKOVICH, LENI |
| 2 | MOSHKOVICH, SAMUEL |
| 3 | NELSON, ALAN |
| 4 | FULOP, GEORGE |
| 5 | NEUMAN, VIOLA |
| 6 | PERL, JENE |
| 7 | KOVACS, ILONA |
| 8 | KOVACS, JOHN |
| 9 | LUKACS, CHARLES |
| 10 | SAMET, PIROSKA PEARL |
| 11 | KALLUS, ELSA |
| 12 | RUDAS, IREN |
| 13 | SAND, RONNIE |
| 14 | SCHOSSBERGER, ANDREW |
| 15 | MEISELS, SAMUEL |
| 16 | NEHEZ, VERA |
| 17 | YASKIL, RACHEL |
| 18 | GLASNER, JUDITH |
| 19 | BRUSZT, IVAN |
| 20 | SZEKELY, IREN |
| 21 | VIG, GYORGY |
| 22 | BAR-NIR, MOSHE |
| 23 | SALAMON ROZENCWEIG, OLGA |
| 24 | GOMBOS, GEORGE |
| 25 | BALASZ, ENDRE |
| 26 | WEISS, LILLIAN |
| 27 | EINHORN, ETA |
| 28 | FEUER, JUDITH |
| 29 | WINTER, PAUL |
| 30 | TESSLER, BUROCH |
| 31 | MOLNAR, PETERNE |
| 32 | LUNGER, ALEXANDER |
| 33 | REICH, ELIZABETH |
| 34 | GEZA, TIMAR |
| 35 | SCHWARTZ, SANDOR |
| 36 | BASCH, ESTHER |
| 37 | SIMON, FRANCES |
| 38 | ANGYALOSI, ENDRE |
| 39 | RASMUSEN, EVA |
| 40 | ANGYALOSI, LASZLO |
| 41 | BLUMENTHAL, PETER |
| 42 | WEINBERGER, JOSE GABRIEL |
| 43 | JENEI, SANDORNE |
| 44 | SZIRT, MARTA |
| 45 | GRUNWALD, ANNA |
| 46 | MELLINGER, FRANCISCO |
| 47 | FRISCH, ILONA |
| 48 | LAZAR-FRANCK, SARA |
| 49 | KATZ, GIZELLA |
| 50 | KAISER, JUDIT |

| | |
|---|---|
| 51 | VASVARI, JANOS |
| 52 | FOX, PETER A. |
| 53 | BREUER, ZIGMOND |
| 54 | SHARON, HAIM |
| 55 | HELLER, STEVEN |
| 56 | DE FERENCZI, ANA ROSENTHAL |
| 57 | KLEIN, ELLA |
| 58 | KLEIN, ALEXANDER |
| 59 | MECHLOVITZ, RIFKA |
| 60 | MARKUS, MARGARET |
| 61 | PATAKI-MARC, STEPHAN |
| 62 | HARRISON, EDITH |
| 63 | GREEN, ISRAEL |
| 64 | WEISS, SHARON |
| 65 | LOEWY, GEORGE |
| 66 | LOEWY, VERONICA |
| 67 | BODNAR, ZOLTAN |
| 68 | BODNAR, PIROSKA |
| 69 | BENJAMIN, JUDITH |
| 70 | RETI, ISTVANNE |
| 71 | LAWSON, SHARON J. |
| 72 | DE FIDELHOC, RIVKA DASKAL |
| 73 | HIRSCH, PERI |
| 74 | FRIEDMAN, ASHER |
| 75 | RADOS, ARTURNE |
| 76 | BASHAN, ITZHAK |
| 77 | BASHAN, MIRIAM |
| 78 | GUGI, SANDORNE |
| 79 | VAJDA, DEZSOE |
| 80 | FEHER, TIBORNE |
| 81 | JAKUBOVIC, JIRI |
| 82 | AGOSTON, PAL |
| 83 | RETI, ILONA |
| 84 | HAUER, ARIE |
| 85 | ENGEL, SHMUEL |
| 86 | ENGEL, ZAHAVA |
| 87 | PREIS, MARGARETA |
| 88 | FNICKEL, YAKOV |
| 89 | FNICKEL, EKATERINA |
| 90 | JONAS, JONA |
| 91 | ENGELMAN, MIRIAM |
| 92 | WEINBERGER, CHANA |
| 93 | WEINBERGER, BINYOMIN |
| 94 | HIRSCHLER, RITA |
| 95 | MEISNER, JOZSEFNE |
| 96 | RADNAI, ISTVANNE |
| 97 | KELETI, PETER |
| 98 | FEKETE, SZUNSIZ |
| 99 | FEKETE, JANOS |
| 100 | BARAK BEN-AMOS |
| 101 | FULOP, GEORGE (heir) |
| 102 | HEVESI, DR. EVA (heir) |
| 103 | RADO, JANOS (heir) |
| 104 | KOSA-BANKI, AGNES (heir) |
| 105 | RADONE-LOFFLER, MARIA (heir) |

| 106 | GLASNER, JUDITH (heir) |
|-----|------------------------|
| 107 | WADLER, CHAYA DEBLINGER (heir) |
| 108 | BLISKO, CECELIA DEBLINGER (heir) |
| 109 | ALTMAN, DAVID (heir) |
| 110 | TORMASI, DAVID (heir) |
| 111 | WESTWOOD, JUDITH (heir) |
| 112 | ROSENBERG, SOL (heir) |
| 113 | WEINGARTEN, SARA (heir) |
| 114 | GROSS, JEFFREY (heir) |
| 115 | BASCH, PAUL (heir) |
| 116 | BASCH-RUSSO, FRAN (heir) |
| 117 | BASCH, M. (heir) |
| 118 | TURET, RACHEL (heir) |
| 119 | GABORNE, BARNA (heir) |
| 120 | BLUMENTHAL, SUSAN (heir) |
| 121 | WEISZ, ALEXANDER (heir) |
| 122 | LITTMAN, AUREL (heir) |
| 123 | ILLES, LASZLONE (heir) |
| 124 | VIDA, IMRENE (heir) |
| 125 | GONDOR, MAGDA (heir) |
| 126 | VALYI, GYORGY (heir) |
| 127 | FELDMAN, ELIHU (heir) |
| 128 | KOVACS, TIBOR (heir) |
| 129 | GRUNWALD, LADISLAU (heir) |
| 130 | GROSS, BRIAN (heir) |
| 131 | FOX, PETER (heir) |
| 132 | PORGES, LEO (heir) |
| 133 | SHIMONY, DAVID (heir) |
| 134 | KNAPP, OSZKARNE (heir) |
| 135 | VALYI, GYORGY(heir) |
| 136 | TOLNAI, JUDIT (heir) |
| 137 | MOSKOVITZ, GABRIEL (heir) |
| 138 | LANDESMAN, SLOMO (heir) |
| 139 | MARKUS, MAGGIE (heir) |
| 140 | PAILAS, EVELYN (heir) |
| 141 | GORELICK, BETTY GLUCK (heir) |
| 142 | HOLLANDER, FAYE (heir) |
| 143 | RICKARD, PATRICIA |
| 144 | GILAD, FAYE (heir) |
| 145 | JUHASZ, OTTONE (heir) |
| 146 | RADOS, PETER (heir) |
| 147 | AGOSTON, PAL (heir) |
| 148 | BASHAN, ITZHAK (heir) |
| 149 | BASHAN, MIRIAM (heir) |
| 150 | STERN, ELISABET (heir) |
| 151 | VAJDA, DEZSOENE (heir) |
| 152 | RETI, DAVID (heir) |
| 153 | ZADOR, JULIA (heir) |
| 154 | MEISEL, AGNES (heir) |
| 155 | DERI, GYORGYNE (heir) |
| 156 | FEHER, PETER (heir) |
| 157 | LEVAI, VILMOS (heir) |
| 158 | LOWI, IMRE (heir) |
| 159 | RADNAI, ANDREA FORRAINE (heir) |
| 160 | RADNAI, ISTVANNE (heir) |

| | |
|---|---|
| 161 | SCHMIDT, TIBOR (heir) |
| 162 | KELETI, PETER (heir) |

## Exhibit B

### Schedule of Plaintiff Incentive Payments

| | | |
|---|---|---|
| 1 | Edith Klein Amster | $5,000 |
| 2 | Francis Bash | $5,000 |
| 3 | Veronika Baum | $5,000 |
| 4 | Alice Besseney | $2,000 |
| 5 | Elisabeth Bleier | $5,000 |
| 6 | Erwin Deutsch | $5,000 |
| 7 | Dr. Joseph Devenyi | $5,000 |
| 8 | Peter Drexler | $5,000 |
| 9 | Barunch Bernhard Epstein | $5,000 |
| 10 | Magda Feig | $2,000 |
| 11 | Michael Fried | $5,000 |
| 12 | Paul Gottlieb | $5,000 |
| 13 | Judith Karmi | $5,000 |
| 14 | Ethel Klein | $5,000 |
| 15 | Mildred Klein | $2,000 |
| 16 | Tamas May | $5,000 |
| 17 | David Mermelstein | $5,000 |
| 18 | Irene Mermelstein | $5,000 |
| 19 | Edith Moore | $5,000 |
| 20 | John J. Rakos | $5,000 |
| 21 | Goerge Rasko | $5,000 |
| 22 | Ana Rosner | $3,000 |
| 23 | Irving Rosner | $5,000 |
| 24 | Georg Moshe Schwarz | $5,000 |
| 25 | Estate of Beorge Sebok | $5,000 |

| 26 | Dr. Laszlo Sokoly | $2,000 |
| 27 | Agnes V. Somjen | $5,000 |
| 28 | Olga Steiner | $2,000 |
| 29 | Jonas Stern | $5,000 |
| 30 | Irene Tibor | $5,000 |
| 31 | Andrew Tibor | $5,000 |
| 32 | Agnes Vadasz | $5,000 |
| 33 | Zoltan S. Weiss | $5,000 |
| 34. | Ms. Edith Reiner | $2,000 |